UNITED STATES of America

v.

**William Christopher TWIGG, III, Appellant.**

UNITED STATES of America

v.

**Henry Alfred NEVILLE, Appellant.**

**Nos. 78–1315, 78–1348.**

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1978.

Decided Nov. 17, 1978.

---

**374**

Barry G. Evertz, Evertz & McClure, Hackensack, N. J., for appellant Twigg.

Michael S. Washor, Brooklyn, N. Y., Richard A. Dienst, New York City, Jay Horlick, Washor & Washor, Brooklyn, N. Y., Schofield, Dienst & Hartnett, New York City, for appellant Neville.

Robert J. Del Tufo, U. S. Atty., Ralph A. Jacobs, Asst. U. S. Atty., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

These appeals are brought by Henry Neville and William Twigg from jury convictions on charges stemming from the illegal manufacture of methamphetamine hydrochloride ("speed"), a schedule II controlled substance. Specifically, defendant Neville was convicted of conspiracy to manufacture and possess with intent to distribute a con-

trolled substance, 21 U.S.C. § 846, 18 U.S.C. § 2; manufacture of a controlled substance, 21 U.S.C. § 841(a)(1); nine counts of use of a telephone to facilitate in the manufacture of a controlled substance, 21 U.S.C. § 843(b), 18 U.S.C. § 2; possession of cocaine, 21 U.S.C. § 844(a); and possession of methamphetamine hydrochloride, 21 U.S.C. § 844(a). Twigg was convicted of: (1) conspiracy to manufacture and possess with intent to distribute a controlled substance and (2) manufacture of a controlled substance. He was acquitted of the substantive charge of possession of a controlled substance with intent to distribute. Both challenge their convictions on the ground that the extensive police involvement in the crime violated due process.[1] We reverse on all counts with the exception of Neville's conviction on possession of cocaine.

## I.

The odyssey of the defendants' entrepreneurial venture in the illegal manufacture of a controlled substance stems from the Drug Enforcement Administration's arrest of Robert Kubica in May 1976 for the illegal manufacture of methamphetamine hydrochloride. Kubica pleaded guilty to one felony count on the federal charge and the other two counts were dismissed. He subsequently received a four year sentence. This was not his first conviction—Kubica had been convicted in state courts on similar charges on previous occasions. In connection with his guilty plea in this case, Kubica agreed to aid the Drug Enforcement Administration in apprehending illegal drug traffickers.

In October 1976, at the request of DEA officials, Kubica contacted an acquaintance of twenty years, Henry Neville, to discuss setting up a speed laboratory.[2] Neville expressed an interest and a discussion of the proposed operation ensued.[3] Over the next several months numerous discussions took place between the two parties as arrangements were made to set up the laboratory. Some of the telephone conversations were recorded by Kubica on equipment supplied by the DEA. The tapes, introduced as evidence at trial, indicate that Neville assumed primary responsibility for raising capital and arranging for distribution of the product, while Kubica undertook the acquisition of the necessary equipment, raw materials, and a production site.

The Government proved to be of considerable assistance to Kubica in carrying out his part of the operation. DEA agents supplied him with two and one-half gallons of phenyl-2-propanone—a chemical essential to the manufacture of speed and the most difficult of the ingredients to obtain. The cost to the Government was $475.00, although the chemical could retail for twice as much. The DEA provided Kubica with about 20 percent of the glassware needed and a rented farmhouse in New Jersey in which to set up the laboratory.[4] In addi-

---

1. In addition, Neville contends that a search warrant obtained was invalid and that the instructions to the jury on reasonable doubt were erroneous. We hold that these contentions are without merit.

2. The record does not indicate why the DEA was interested in Neville, although Kubica testified that in 1973 he had operated a speed laboratory with Neville which produced a few pounds of the drug.

3. Kubica's testimony on direct examination was as follows:

   Q. How did this come about that you contacted [Neville]? What did you do to attempt to make this connection?
   A. Well, I was directed by the DEA. They asked me to reestablish my contact with him.

   Q. And what did you do in order to attempt to reestablish your contact?
   A. Called on the telephone.

4. Cross-examination of Kubica revealed, *inter alia*, the following:

   Q. Is there one single ingredient that is absolutely necessary in order to make this "Speed," if I can use that colloquialism, that was made by you?
   A. One that is absolutely necessary?
   Q. Yes, without which you could not make "Speed."
   A. Yes, sir.
   Q. Well, what is that one ingredient?
   A. Phenyl-2-propenol [sic]. . . .
   Q. Who gave you the P-2-P?
   A. Agents of the DEA.
      *    *    *    *    *    *

tion, the DEA officials made arrangements with chemical supply houses to facilitate the purchase of the balance of the materials by Kubica under the business name of "Chem Kleen." Kubica personally bought all of the supplies (with the exception of one separatory funnel) with approximately $1500.00 supplied by Neville.

On March 1, 1977, Neville introduced Kubica to William Twigg, who apparently got involved in the operation to repay a debt to Neville. Twigg accompanied Kubica on a trip to several chemical supply houses. Later that day, the laboratory was set up at the farmhouse. The laboratory operated for one week, producing approximately six pounds of methamphetamine hydrochloride. Kubica was completely in charge of the entire laboratory. Any production assistance provided by Neville and Twigg was minor and at the specific direction of Kubica. Twigg often ran errands for groceries or coffee, while Neville spent much of his time away from the farmhouse.

On March 7, Neville left the farmhouse with the drugs in a suitcase. Kubica notified the DEA agents, who arrested Neville driving down the road. A search of the car revealed, in addition to the suitcase containing six pounds of methamphetamine hydrochloride, a Lysol can containing cocaine and some more speed. Twigg was arrested at the farmhouse.

## II.

■ It should be made clear from the outset that our reversal is not based on the entrapment defense. The entrapment defense requires an absence of predisposition on the part of the defendant to commit the crime. *See United States v. Russell*, 411

Q. Wasn't this [farmhouse] rented by agents of the United States Government?
A. That's what I was told by the agents, yes.
Q. Well, it wasn't rented by Henry Neville, was it? Yes or no?
A. No, sir.
Q. Would it be fair to say, then not only were they supplying you chemical materials, the necessary ingredient P-2-P, but the United States Government also supplied the location for the commission of the crime?

U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Whether predisposition is present is a question of fact and was properly submitted to the jury in this case.[5] By convicting the defendants, the jury rejected the entrapment defense. On appeal, we must inquire: viewing the evidence most favorable to the Government, could a jury find predisposition? *United States v. Townsend*, 555 F.2d 152, 156 (7th Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977); *see Tzimopoulos v. United States*, 554 F.2d 1216 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977); *United States v. Gurule*, 522 F.2d 20, 23 (10th Cir. 1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976).

■ The evidence of Neville's predisposition came from Kubica's testimony. Kubica testified to Neville's apparent willingness to participate in the manufacturing venture. No reluctance was expressed and no inducements were needed. Kubica also said that he and Neville had engaged in the manufacture of speed a few years earlier. Neville did not take the stand and no evidence was presented to contradict the evidence of predisposition. Thus, a sufficient basis exists for allowing a jury finding of predisposition to stand.

■ Twigg did not raise the issue of entrapment on appeal. The defense would not be available to him because he was brought into the criminal enterprise by Neville, not a government agent. *See United States v. Garcia*, 546 F.2d 613, 615 (5th Cir.), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *United States v. Mayo*, 162 U.S.App.D.C. 171, 498 F.2d 713 (1974).

A. Yes, sir.
\* \* \* \* \* \*
Q. You were the one that put the materials together in this laboratory, acting as an agent of the United States Government, am I correct?
A. Yes.

5. The appellants have not challenged the jury instructions on entrapment.

The contention that defendants raise which we find persuasive is that the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law. Although no Supreme Court decision has reversed a conviction on this basis, the police conduct in this case went far beyond the behavior found permissible in previous cases.

In *United States v. Russell, supra*, the defendant was convicted of the illegal manufacture and sale of methamphetamine. The facts revealed that an undercover agent for the Federal Bureau of Narcotics and Dangerous Drugs went to the defendant's home on an assignment to locate a methamphetamine laboratory. He said that he represented an organization interested in purchasing large quantities of speed. He offered to supply the defendants with phenyl-2-propanone in exchange for one-half of the drug produced. The offer was accepted and one of the parties revealed that they had been operating a speed laboratory for seven months.

The agent visited the laboratory on two occasions and on both visits saw significant quantities of P–2–P not supplied by the Government. In fact, the agent only supplied the defendants with a single 100-gram bottle of the chemical. The extent of his participation in the manufacturing process was that on one occasion he picked up some aluminum foil that had fallen to the floor.

The Court of Appeals for the Ninth Circuit, in reversing the defendant's conviction, seemingly relied on two theories. *United States v. Russell*, 459 F.2d 671 (9th Cir. 1972), *rev'd*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). First, the government supply of P–2–P constituted entrapment as a matter of law regardless of predisposition. Second, the police conduct was so repugnant that due process principles barred prosecution.

The Supreme Court reversed as to both theories. The Court held that the absence of predisposition is the focal point of the entrapment defense. Since the defendant conceded predisposition, that defense could not be raised.

On the second theory, the Court explicitly left the defense available, but decided that it was not applicable on the facts of the case:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . . the instant case is distinctly not of that breed. [The agent's] contribution of propanone to the criminal enterprise *already in process* was scarcely objectionable. . . . The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

411 U.S. at 431–32, 93 S.Ct. at 1643 (emphasis supplied).

The Court went on to make an important point not present here—that the defendant "was an active participant in an illegal drug manufacturing enterprise which began before the government agent appeared on the scene . . . ." *Id.* at 436, 93 S.Ct. at 1645.

The only other Supreme Court case to consider the fundamental fairness defense in this type of situation was *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Hampton was convicted of distributing heroin despite his contention that the heroin had been supplied by a government informer and sold by the defendant to an undercover agent. The trial court refused to instruct the jury that if those facts were believed then they must acquit, and the defendant appealed.

The Supreme Court affirmed the conviction, but wrote three separate opinions. Justice Rehnquist's plurality opinion, joined by Chief Justice Burger and Justice White, stated that predisposition, which the defendant conceded existed, should operate as a bar to the fundamental fairness defense as well as to the conventional entrapment

defense. The opinion argued that the remedy of "the criminal defendant with respect to the acts of government agents . . . lies solely in the defense of entrapment." *Id.* at 490, 96 S.Ct. at 1650.

Justice Powell, joined by Justice Blackmun, concurred in the result but refused to foreclose reliance on the fundamental fairness defense even where predisposition is shown. Justice Powell would base the defense on due process principles or the Court's supervisory power. He warned, however, that instances where this defense would be successful will be rare. "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring).

The dissenting justices argued that the defense of entrapment should focus on the police conduct. They believed that the behavior of the law enforcement officers in *Hampton* was sufficiently offensive to bar conviction.

**6.** The dissent suggests that we are embracing "a rule that allows otherwise 'outrageous' conduct in the pursuit of small-time pushers but forbids these tactics when aimed at manufacturers of drugs and their financiers." Dis. Op. at 387. This is simply not the case. We are adhering to Justice Powell's reasoning that in evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it. *Hampton v. United States, supra,* 425 U.S. at 495–96 n. 7, 96 S.Ct. 1653. Futhermore, Justice Powell's citation of *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971), in *Hampton,* 425 U.S. at 493 n. 3, 96 S.Ct. 1651 indicates a willingness to distinguish between manufacturing operations and distribution activities when considering the due process defense. It also demonstrates that Justice Powell, unlike the dissent here, Dis. Op. at 386 n. 15, believes that *Greene* involved police conduct more egregious than *Hampton* or *Russell.*

**7.** The dissent believes that the Government's role in instigating the crime—an element not present in *Russell* or recent circuit cases—should not be an important consideration because "there was government instigation in *Hampton* and it did not lead to a reversal." Dis. Op. at 387.

Whether or not there was government instigation in *Hampton* is a factual question which the plurality and concurring opinions left unre-

*Hampton* was concerned with the sale of an illegal drug, a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory. In such a situation the practicalities of combating drug distribution may require more extreme methods of investigation, including the supply of ingredients which the drug ring needs.[6] Furthermore, a reading of the jury instruction requested by the defendant in *Hampton* reveals that he was concerned merely with the principle that if the narcotics were supplied to him by an informant acting on behalf of the Government, then he must be acquitted as a matter of law. *Id.* at 488, 96 S.Ct. 1646.[7] In this case, however, we are not only concerned with the supply by government agents of necessary ingredients for manufacture, but we also have before us a crime, unlike *Hampton,* conceived and contrived by government agents.

■ The rule that is left by *Hampton* is that although proof of predisposition to

solved. According to the Government's version of the facts, the defendant (not the Government) initiated the crime and supplied the heroin. Hampton, on the other hand, claimed that he told the government informant that he was short of cash and that the informant suggested that they sell a non-narcotic counterfeit drug as heroin. The defendant admitted to soliciting and carrying out the sales which led to his arrest. *Hampton v. United States, supra,* 425 U.S. at 485–87, 96 S.Ct. 1646.

The only significance of the defendant's version of the facts relates to the jury instructions he proffered which the trial court refused to give. Significantly, the proffered instructions made no mention of government incitement of the crime. The sole issue then and the sole issue appealed to the Supreme Court was whether the supply of contraband to the defendant by the Government required acquittal as a matter of law. *Id.* at 488, 96 S.Ct. 1646. This was the only question considered in the concurring opinion by Justice Powell, who felt that the outcome of the case was "controlled completely by *Russell.*" *Id.* at 495, 96 S.Ct. 1646. Thus, it appears that the Government did not instigate the crime in *Hampton.* Admittedly, Justice Brennan refers to government instigation of the crime; however, he also believed that the conviction should be reversed.

commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was "outrageous." *See United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978); *United States v. Johnson*, 565 F.2d 179, 181 (1st Cir. 1977). Where the facts can easily be resolved, the validity of the defense is to be decided by the trial court. *United States v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977).[8]

The type of conduct that would be considered outrageous by Justice Powell or the Supreme Court is unclear. However, we find the reasoning in two cases decided prior to *Hampton* helpful in resolving this problem.

In *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), this court reversed a conviction primarily on fundamental fairness grounds. On facts similar to *Hampton*, Judge Hastie wrote:

> But when the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration. Moreover, such conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing.

*Id.* at 1085.

Although *Hampton* may have attenuated *West's* applicability in cases involving similar facts, we believe that the principles enunciated by Judge Hastie remain sound today.

In an earlier case, *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the Ninth Circuit found sufficient government overinvolvement to preclude a conviction.

Defendants were convicted of charges stemming from the illegal manufacture of alcohol. An undercover agent reestablished contact with the defendants after their previous arrest on bootlegging charges. For over two years the agent was involved in the defendants' operations—offering to supply materials, an operator, and location for the still, and actually supplying sugar at wholesale prices. The agent was the sole purchaser of all the liquor produced by the illegal still.

The Ninth Circuit held that the entrapment defense was not available because the defendants were predisposed to commit the crime. However, the court ruled that the defendants could not be convicted because of overreaching by the Government:

> We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators. As pointed out in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 . . . a certain amount of stealth and strategy "are necessary weapons in the arsenal of the police officer." But, although this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative.

*Id.* at 787.

Our research has uncovered two cases which bear some resemblance to the facts in the instant case. In *United States v. Leja*, 563 F.2d 244 (6th Cir. 1977), the defendant Leja approached a government informant, Sawicki, and suggested that they set up a laboratory for the manufacture of phencyclidine, a controlled substance. Defendant Cody was brought into the plan and was responsible for supplying glassware and

---

**8.** When the facts concerning the nature of the police conduct are disputed, it is unclear whether a jury resolution of the issues is required prior to a ruling by the court. *See* *United States v. Johnson, supra*, 565 F.2d at 181. As the facts in the instant case are uncontested, we need not decide this question.

money while Sawicki contributed the chemicals and Leja the technical expertise. During the production period, a DEA laboratory analyst, brought in to insure against possible explosion, advised Leja on the process when he encountered difficulties. The Sixth Circuit rejected the fundamental fairness defense and affirmed the convictions of both defendants.

*Leja*, however, is distinguishable from the present case. Most significant is that in *Leja*, the criminal plan originated with the defendant. Although the DEA facilitated the operation, it did so only after the defendants formulated the plan and approached the DEA informer. In the instant case, however, the DEA and its informant, Kubica, plotted the venture and thereafter initiated contact with Neville.

In *United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976), the Ninth Circuit refused to find that the Government's conduct was so outrageous as to violate due process. The facts also involved the illegal manufacture of methamphetamine. The informant provided necessary materials and actively participated in the manufacturing process.

Like *Leja*, but unlike the facts before us, *Smith* is a case where the defendant concocted the scheme and began implementing it before the DEA got involved. Unlike the instant case, the Government did not sow the seeds of criminality and lure the defendant into a conspiracy. Furthermore, the defendant in *Smith*, not the informer, was completely in charge of the operation. These two decisions provide no support for the Government's contention that outrageous conduct does not exist in this case.

Attempting to draw general principles of law from these cases is not a simple task. We are mindful of the difficulties of defining specific limits on law enforcement techniques. Recognition must be given to the many challenges confronting police agencies today, especially in the drug law enforcement area. Infiltration of criminal operations by informers and undercover agents is an accepted and necessary practice. Yet, this court cannot "shirk the responsibility that is necessarily in its keeping . . . to accommodate the dangers of overzealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals." *Sherman v. United States*, 356 U.S. 369, 381, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring in result). "Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality." *United States v. Archer*, 486 F.2d 670, 677 (2d Cir. 1973) (Friendly, J.).

## III.

■ Considering the cases and principles set forth above, we have no trouble in concluding that the governmental involvement in the criminal activities of this case has reached "a demonstrable level of outrageousness."

At the behest of the Drug Enforcement Agency, Kubica, a convicted felon striving to reduce the severity of his sentence, communicated with Neville and suggested the establishment of a speed laboratory. The Government gratuitously supplied about 20 percent of the glassware and the indispensable ingredient, phenyl-2-propanone. It is unclear whether the parties had the means or the money to obtain the chemical on their own. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials. Kubica, operating under the business name "Chem Kleen" supplied by the DEA, actually purchased all of the supplies with the exception of a separatory funnel. (The funnel was secured by Twigg at the direction of Kubica who was engaged in operating the laboratory.) When problems were encountered in locating an adequate production site, the Government found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory. Again, there was no cost to the defendants. At all times during the production process, Kubica was completely in charge and furnished all of the

laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of Kubica.

These instances of police involvement must be evaluated against the following backdrop. The only evidence that Neville was predisposed to commit the crime was his receptivity to Kubica's proposal to engage in the venture and the testimony of Kubica that he had worked with Neville in a similar laboratory four years earlier. Unlike other cases rejecting this defense, the police investigation here was not concerned with an existing laboratory, *United States v. Russell, supra*; the illicit plan did not originate with the criminal defendants, *United States v. Leja, supra*; *United States v. Smith, supra*; and neither of the defendants were chemists—an indispensable requisite to this criminal enterprise.[9]

According to Justice Powell:

Due process in essence means fundamental fairness, and the Court's cases are replete with examples of judgments as to when such fairness has been denied an accused in light of all the circumstances. . . . The fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances. . . . Nor do I despair of our ability in an appropriate case to identify appropriate standards for police practices without relying on the "chancellor's" "fastidious squeamishness or private sentimentalism."

*Hampton v. United States, supra*, 425 U.S. at 494–95 n. 6, 96 S.Ct. at 1652 n. 6 (Powell, J., concurring).

When Kubica, at the instance of the DEA, reestablished contact with Neville, the latter was not engaged in any illicit drug activity. Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.[10]

## IV.

While the foregoing reasons mandate the reversal of Neville's conviction, Twigg's circumstances are somewhat different.

■ The traditional entrapment defense is only available to those defendants brought into the criminal enterprise directly by government agents. If a defendant is induced by a third party not connected with a law enforcement official to commit a crime, then the defendant cannot raise the defense. *See United States v. Garcia*, 546 F.2d 613, 615 (5th Cir.), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *United States v. Conversano*, 412 F.2d 1143, 1148 (3d Cir.), *cert. denied*, 396 U.S. 905, 90 S.Ct. 219, 24 L.Ed.2d 181 (1969). However, no case has been found that considers this issue when overreaching by the Government is the basis of the defense. The fundamental fairness defense compels us to resolve this question in light of all the

9. We also find it baffling that the Government would urge the reduction of the jail sentence for a man who may have run as many as 50 or 100 speed laboratories in the past in exchange for the convictions of two men with no apparent criminal designs and without the expertise required to set up a single laboratory.

10. "[T]here is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973) (Friendly, J.) (footnote omitted).

382

circumstances. We are reluctant to establish a *per se* rule barring the use of this defense to anyone who was not directly induced by a government agent.

■ Twigg did not become involved in this criminal enterprise until March 1, 1977 —the day the laboratory went into operation. His reason for becoming involved was to repay a debt owed to Neville. Neville introduced Twigg to Kubica, and then Twigg and Kubica went shopping for additional supplies, which Kubica purchased. There is no evidence to suggest that Twigg was aware of the ultimate purpose of these errands until informed by Kubica after returning to the farmhouse. All actions taken by Twigg from that time until his arrest were at the specific direction of Kubica, the government agent. Twigg contributed nothing in terms of expertise, money, supplies, or ideas. It also appears that Twigg would not even have shared in the proceeds from the sale of the drug. In light of these facts, we hold that Twigg's conviction is also tainted by the conduct of the DEA agents and that fundamental fairness requires its reversal.[11]

V.

The judgment of the district court against Neville will be ‑ reversed on all

counts except count XIV (possession of cocaine). The judgment of the district court against Twigg will be reversed.

ADAMS, Circuit Judge, dissenting.

For almost fifty years the legal community has been divided over what a court's attitude should be when law enforcement agents are accused of encouraging criminal activity so as to gather evidence for a prosecution. Such police activity is generally referred to as "entrapment" and historically there have been two basic views on how it should be treated. On one side, it has been argued that government activity of this nature should be evaluated on an "objective" basis—that is, that a court should judge the propriety of the law enforcement techniques themselves—and that official involvement that goes "too far" should not be tolerated.[1] On the other side, it has been said that only the "subjective" intent of the criminal should be weighed, and that he cannot be considered "entrapped" if he was "predisposed" to commit the crime regardless of the extent of governmental involvement.[2]

It can no longer be doubted that the Supreme Court has resolved this debate in

---

11. In addition, it is a general rule of criminal law that one conspirator cannot be convicted if all of the co-conspirators have been acquitted. W. LaFave and A. Scott, Criminal Law, § 62, p. 488 (1972). Count I of the indictment charged Twigg with conspiring with Neville and others, "both known and unknown to the Grand Jury." An examination of the record fails to reveal evidence that Twigg conspired with anyone other than Neville. Thus, if Neville is acquitted on the conspiracy charge for the reasons stated above, then Twigg must also be acquitted on the conspiracy count.

1. *See United States v. Russell*, 411 U.S. 423, 439, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (Stewart, J., dissenting); *Sherman v. United States*, 356 U.S. 369, 378, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring); *Sorrells v. United States*, 287 U.S. 435, 453, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (Roberts, J., separate opinion). In *Sorrells*, Justice Roberts clearly stated the objective view:

> The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between

the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy.

287 U.S. at 459, 53 S.Ct. at 219. The objective view has, in differing forms and degrees, continued to command the allegiance of a minority of the Supreme Court. In each of the cases cited above, however, it was rejected by the majority of the Court.

2. " . . . [T]he entrapment defense 'focuses on the intent or predisposition of the defendant to commit the crime,' rather than upon the conduct of the Government's agents." *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976). "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). *See Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

favor of those who wish to emphasize the accused's predisposition to commit the crime.[3] When, as in the case before us now, the defendants are found to have been willing participants in the crime, they may not avoid conviction by claiming that they were entrapped. Thus, although Neville argued the classical entrapment theory both at the trial and on appeal, the jury finding of predisposition, supported here by substantial evidence, effectively precludes reversal on such grounds.

But the defendants also contend that even if they are foreclosed from resorting to the traditional entrapment defense, the official involvement in this particular case was so extensive that they were denied due process of law. The possibility of scrutiny of law enforcement techniques under the due process clause has been left open by the Supreme Court.[4] The only issue in this appeal, therefore, is what margin, if any, is left by the case law for vindication under the due process clause of the policies voiced by those favoring the objective approach to analyzing a claim of entrapment.

Like the majority, I view the government involvement here with a certain degree of concern. Indeed, I do not personally approve of the level of official involvement in this particular case. Unlike the majority, however, I do not believe that the government's activity can be classified as unconstitutional, at least not under the most recent decisions of the Supreme Court. As I read those cases, the possibility of due process review of the activities of our law enforcement agencies was reserved only for truly "outrageous" cases. Due process analysis was not intended simply to reestablish the objective approach to entrapment under a new name. Because I do not believe this situation presents the intolerable set of facts necessary to warrant resort to the due process clause, I must dissent.

## I.

This case deals with the manufacture of drugs. As the majority notes, in the fall of 1976, the Drug Enforcement Agency (DEA) utilized a convicted drug offender, Robert Kubica, to suggest to Henry Neville that they reestablish an amphetamine manufacturing operation similar to that in which Kubica and Neville had previously been engaged in New York. The government thus suggested the illegal scheme, and Neville maintained at trial that he was entrapped.

---

3. *See* note 2 *supra.*

The objective position, however, appears to remain the more popular among the commentators and in the academic community. *See* Park, *The Entrapment Controversy*, 60 Minn.L. Rev. 163, 167 n. 13 (collecting authorities; Professor Park himself prefers a modified subjective approach). The objective approach was endorsed by the American Law Institute in 1962. Model Penal Code § 2.13 (Official Draft, 1962).

There also appears to be a greater willingness on the part of some states to accept the objective view, despite its rejection by the federal courts. *See State v. Mullen*, 216 N.W.2d 375 (Iowa 1974); *People v. Turner*, 390 Mich. 7, 210 N.W.2d 336 (1973); *Grossman v. State*, 457 P.2d 226 (Alaska 1969). *See also State v. Talbot*, 71 N.J. 160, 364 A.2d 9 (1976); Note, 8 Seton Hall L.Rev. 316 (1977).

In *Talbot* the New Jersey Supreme Court recognized that its view of the proper contours of the entrapment defense differed from that expressed by the Supreme Court in *Hampton* but noted that it was free to reach its own conclusion within the confines of New Jersey law. Needless to say a federal appeals court enjoys no such freedom.

4. *Hampton v. United States*, 425 U.S. 484, 491, 96 S.Ct. 1646, 48 L.Ed.2d 113 (Powell, J., concurring); *Id.* 495, 96 S.Ct. 1653 (Brennan, J., dissenting). The *Hampton* decision is fully discussed *infra.*

It has often been suggested that, as an alternative to use of the due process clause, courts may base their refusal to countenance outrageous law enforcement practices upon their supervisory powers. These powers generally have been used to regulate the conduct of judicial proceedings, and their extension to the governance of law enforcement agencies traditionally "supervised by the executive branch or by passage of laws by Congress," *United States v. Leja*, 563 F.2d 244, 247 (6th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978), raises serious questions about the power and role of the federal judiciary in our society. Because I question the authority of a federal court to regulate the conduct of DEA agents, I believe the question of government overinvolvement should be considered in terms of the constitutional duty of the courts to protect individual rights under the due process clause.

In addition to taking this initiative, the DEA supplied the participants with eight kilograms of phenyl-2-propanone,[5] with certain other chemicals, and, in the person of Kubica, with the chemical expertise necessary to manufacture the contraband. The government also furnished some of the laboratory glassware and, ultimately, the farmhouse that served as the site for the laboratory. Neville provided eighty per cent of the capital needed for the operation and the "contacts" through which the illegal drugs would be sold. He also brought into the conspiracy the defendant Twigg, who assisted Kubica in obtaining materials and with the actual manufacture of the drug.

In sum then, the combination centered around Kubica's chemical expertise and Neville's financing and connections. Twigg appears to have been only an assistant. That the idea to renew the previously existing drug manufacturing and distribution team of Kubica and Neville can be traced to the government is beyond question; however, it is clear that Neville and Twigg were found to be previously disposed to participate in the venture and were active participants throughout. I do not understand the majority to disagree with this outline of the facts.

## II.

The majority and I differ only on the proper application of the remnant of the "objective" analysis left open by Mr. Justice Powell in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the latest Supreme Court statement on the subject. In *Hampton* a plurality of three Justices—the Chief Justice, Mr. Justice Rehnquist, and Mr. Justice White—

urged a *per se* rule that would allow defenses based on the acts of government agents *only* when defendants establish that they were not predisposed to commit the crime.[6] Such a rule would eliminate any possibility of judicial scrutiny of the law enforcement techniques themselves, and thus constitute a rejection of the objective approach.

Mr. Justice Powell, in a concurring opinion joined by Mr. Justice Blackmun, agreed that the typical entrapment defense should be focused entirely on the question of predisposition, and thus endorsed the dominant "subjective" approach. But Justice Powell declined to adopt a rule forswearing *ever* overturning a conviction because of the extent or nature of the governmental overinvolvement in the crime. He therefore left open some possibility of use of an "objective" analysis based on governmental conduct, at least in certain extreme cases:

> The plurality thus says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances.

> I do not understand *Russell* or earlier cases delineating the predisposition-focused defense of entrapment to have gone so far, and there was no need for them to do so. In those cases the Court was confronted with specific claims of police "overinvolvement" in criminal activity involving contraband. Disposition of those claims did not require the Court to consider whether overinvolvement of Government agents in contraband offenses could ever reach such proportions as to bar conviction of a predisposed defendant as a matter of due process. Nor

---

**5.** Phenyl-2-propanone is an ingredient indispensible to the manufacture of amphetamines, or "speed." Although p-2-p is not contraband, it is difficult to obtain. *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1978).

**6.** In his plurality opinion in *Hampton,* Justice Rehnquist stated:

"In [*Russell,*] [w]e ruled out the possibility that the defense of entrapment could *ever* be

based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established. . . . The remedy of the criminal defendant with respect to the acts of Government agents, which . . . are encouraged by him, lies *solely* in the defense of entrapment." 425 U.S. at 488–90, 96 S.Ct. at 1649–50. (Emphasis supplied.)

have we had occasion yet to confront Government overinvolvement in areas outside the realm of contraband offenses. In these circumstances, I am unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles.[7] The three dissenting Justices—Mr. Justice Brennan, Mr. Justice Stewart, and Mr. Justice Marshall—agreed with Justice Powell that the possibility of a due process test of governmental overinvolvement remained open.[8] Because five members of the Court thus expressed support for this possibility, it may fairly be assumed to constitute the prevailing rule.

It seems apparent, however, that the remnant of the objective analysis left standing by *Hampton* may be applied only to truly "outrageous" cases. As a matter of logic this must be true if the decisions of the Supreme Court in *Sorrells, Sherman, Russell* and *Hampton* are to have any force. For, once the Supreme Court has decided to eschew close scrutiny of law enforcement techniques under the objective approach to entrapment, it would seem somewhat inconsistent for it to announce a new doctrine allowing just such a review. Had a majority of the Court intended that due process review of government involvement in crime should constitute anything more than a seldom used judicial weapon reserved for the most unusual cases, it would have been more forthright for it to have adopted the position eloquently urged by the minority voices in *Sorrells, Russell* and *Hampton,* instead of seeking to reach the same result under a different rubric.

Not surprisingly, the language used in both *Russell* and *Hampton* indicates that no such back-door reincarnation of the objective approach was intended. *Russell* speaks

of conduct "so outrageous" that it would violate "fundamental fairness" and be "shocking to the universal sense of justice" mandated by the due process clause.[9] Justice Powell, in his *Hampton* concurrence, is more direct in explaining that this approach is only rarely—if ever—to be resorted to by a court:

> I emphasize that the cases, *if any,* in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach *a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses,* which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, . . . which is one of the major contributing causes of escalating crime in our cities. . . . Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.[10]

We must therefore inquire whether the facts of this case reach that "demonstrable level of outrageousness" necessary to warrant judicial interference.

### III.

Admittedly, it is difficult to know what standards to apply in order to conclude that a given course of action is "outrageous." Nonetheless it is necessary to begin somewhere, and perhaps the best place to start is with *Hampton* itself. Although a majority of the Court in *Hampton* concluded that it was possible to reverse an exceptional case on grounds of government "overinvolvement," a different majority also concluded

7. *Id.* at 492–93, 96 S.Ct. at 1651–52 (Powell, J., concurring) (citations omitted).

8. The dissenters endorsed the traditional objective position for entrapment cases generally, but they also specifically agreed with Justice Powell's position on the possibility of use of the due process clause, or the Court's supervisory powers, to overturn convictions secured through "sufficiently offensive" official conduct. *Id.* 497, 96 S.Ct. 1653 (Brennan, J., dissenting). In the view of the dissenters, *Hampton* itself was such a case.

Mr. Justice Stevens did not participate in *Hampton.*

9. 411 U.S. at 431–32, 93 S.Ct. at 1643.

10. 425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (emphasis supplied).

that on the actual facts of *Hampton* such an extraordinary intervention by the Court was unwarranted.

Yet the government involvement in *Hampton* was extensive. Hampton was arrested for the distribution of heroin. Government agents apparently provided the contraband, arranged for the sale, and purchased the drug. As Justice Brennan noted in dissent: "The Government is doing nothing less than buying contraband from itself through an intermediary and jailing the intermediary."[11] But the hard truth is that the Supreme Court did not find *Hampton* to reach that "demonstrable level of outrageousness" required by Mr. Justice Powell.

The facts in this case are less persuasive for reversal than were those in *Hampton*. Here, none of the chemicals, glassware, money, or skill provided by the government was itself contraband. Ultimately these items were used to create amphetamines, and this was done with the active participation of the government, but by that time both defendants were themselves taking an active part in the criminal conspiracy. It is true that the government, through Kubica, suggested the operation, but that is the situation in many undercover operations, and was the case in *Hampton*. As for the decision to provide the farmhouse as a laboratory site, it appears not only not to have been "outrageous," but to have been a justifiable response under the circumstances.[12]

I do not mean to suggest that the government activity in this case was not substantial. The wisdom of using agents provocat-eurs in this fashion and at such expense in time and money is open to serious question, both on ethical and tactical grounds. Although many courts have allowed such undercover activity, few have done so with specific approval or encouragement.[13] But it is entirely another matter, in the light of *Russell* and *Hampton*, to conclude that this case, unlike others involving the use of comparable tactics, is in someway "shocking" or "outrageous." In short, this does not appear to be the extreme case contemplated by Mr. Justice Powell in *Hampton*.

The majority's argument to the contrary relies primarily on pre-*Hampton* cases. Like the majority, I admire Judge Hastie's excellent opinion for this Court in *United States v. West*,[14] and regret in many ways that the Supreme Court did not find it more persuasive in *Hampton*. But whatever its merits may have been, I cannot, unfortunately, join the majority in their belief that that opinion or its "principles" can survive *Hampton*. The facts of *West*, as the majority notes, are virtually indistinguishable from *Hampton*. I do not see how we can rely on *West* to tell us what is "outrageous" if the Supreme Court has determined in a subsequent opinion, and after specifically considering *West*, that government involvement in a similar perhaps even more questionable situation, is not "outrageous" enough to justify a reversal.[15]

In finding a demonstrable level of outrageousness on the facts here, the majority is particularly conscious of the government's role in instigating the crime. Admittedly,

---

11. *Id.* at 498, 96 S.Ct. at 1654 (Brennan, J., dissenting).

12. Neville had announced his intention of standing guard with a loaded shotgun while the laboratory was in operation. The government's decision to guide the lab site to a relatively isolated area in order to avoid possible danger to innocent people was thus a safety measure. *See* Brief for Appellee at 7–8.

13. *See, e. g., United States v. Leja,* 563 F.2d 244, 246 (6th Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978) ("We cannot affirmatively approve of the government's activity in this case. . . . Our guardianship of constitutional principles, however, is not measured by personal distaste").

14. 511 F.2d 1083 (3d Cir. 1975).

15. The other case noted by the majority, *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971), concerned government involvement to my mind less extensive than the activity complained of in either this case or *Hampton*. There the government provided only a market for the contraband, and money for one easily obtainable ingredient, sugar. It did not assist in the production of the contraband itself. In *Greene* the most troubling element of the government's involvement—continued persuasion of defendants to produce the contraband—seems to go to defendants' predisposition or lack of it. In my view, therefore, that opinion, too, is of doubtful validity after *Russell* and *Hampton*. *But see* 425 U.S. at 493 n. 3, 96

this element of provocation was not present in either *Russell* or the recent decisions of other circuits distinguished in the majority opinion.[16] But I do not believe that government incitement, however much I question its advisability, can be seen as the crucial element establishing the level of outrageousness necessary to find a violation of the due process clause. I am so convinced for three reasons.

First, there was government instigation in *Hampton* and it did not lead to a reversal.[17] The majority distinguishes *Hampton* by suggesting that "extreme methods" may be more justifiable in cases involving the sale of drugs, "a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory." Majority opinion, *supra* at 378. Whether or not laboratories are, in fact, easier to detect, I am reluctant to embrace a rule that allows otherwise "outrageous" conduct in the pursuit of small-time pushers but forbids these tactics when aimed at manufacturers of drugs and their financiers. If instigation of the crime is permissible in the former case, I do not see how we can invoke the due process clause to forbid it in the latter.

Second, a claim of instigation or incitement appears to be logically connected to the question of predisposition. Government instigation is important because it raises questions about the defendant's intent: it must be determined whether he was predisposed to commit the crime or whether the governmental activity "deceptively implanted the criminal design" in his mind. *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). This is the traditional entrapment defense. The defendants here argued that they were lured, in effect, into the criminal scheme by government agent Kubica. Entrapment might have been found on such facts, but the jury concluded that Neville and Twigg were predisposed to commit the crime. Once one credits this finding, the problem of instigation, although it remains an element of the government activity, should assume a much less important position in the analysis of this appeal.[18]

Third, instigation of a crime may be "outrageous" in the context of some forms of criminal activity but acceptable in the context of others. One can hardly disagree

S.Ct. 1646 (Powell, J., concurring). Nor has the Ninth Circuit in more recent years read *Russell* to allow anything other than the most limited type of due process claim. *See United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976); *United States v. Lue*, 498 F.2d 531 (9th Cir.), *cert. denied* 419 U.S. 1031, 95 S.Ct. 513, 42 L.Ed.2d 306 (1974).

Both *Greene* and *West* provoked dissents, by Judge Merrill in the former case and by Judge Weis in the latter. The conclusion is inescapable that the views expressed in those opinions better reflect those of the majority of the Supreme Court.

**16.** Majority opinion, *supra*, at 379–380.

**17.** Nor is *Hampton* the only case of actual inducement ever confronted by the Supreme Court. Most consensual crime investigation involves elements of inducement. Even an offer to purchase heroin from a suspect may be described as an instigation of the sale.

That the "idea" for the crime originated with the government is not, at least in and of itself, fatal to a prosecution. As Justice Holmes noted in a drug-related case fifty years ago:

> . . . Casey according to the story, was in no way induced to commit the crime beyond the simple request of Cicero to which he seems to have acceded without hesitation

and as a matter of course. . . . We are not persuaded that the conduct of the officials was different from or worse than ordering a drink of a suspected bootlegger.

*Casey v. United States*, 276 U.S. 413, 419, 48 S.Ct. 373, 374, 72 L.Ed. 632 (1928).

**18.** The majority opinion, despite its acceptance of the jury's finding of predisposition, seems at times reluctant to fully accept its rejection of the entrapment claim. Thus the majority notes that "[T]he only evidence that Neville was predisposed to commit the crime was his receptivity to Kubica's proposal to engage in the venture and the testimony of Kubica that he had worked with Neville in a similar laboratory four years earlier." Majority opinion, *supra*, at 381. Later it is stated: "Using Kubica . . . the DEA agents deceptively implanted the criminal design in Neville's mind." *Id.* at 381. And later still, the government is criticized for pursuing Neville when, "as far as the record reveals, he was lawfully and peacefully minding his own affairs." *Id.*

But the majority agrees that the evidence was sufficient to support a finding of predisposition and a rejection of the entrapment argument. Given the jury's findings, the defendants cannot properly be described as innocents lured into this criminal enterprise. They were

with Judge Friendly that it would be "unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums."[19] But, as Justice Powell recognized in *Hampton*,[20] contraband offenses present a different question. In the field of drug enforcement, instigation is quite common. Indeed, the use of instigation as a primary technique in large part distinguishes the DEA from other law enforcement agencies.[21] To place so heavy an emphasis on instigation as an important element of "outrageous" conduct might well make effective enforcement of our drug laws most difficult. Under these circumstances, I am unable to join the Court in relying on the government's "instigation" of this conspiracy as support for the conclusion that the government involvement here was "outrageous."[22]

It is true, of course, that the government did more here than "suggest" the operation.

Through Kubica it provided chemicals, some laboratory equipment, money, and chemical expertise. But it must be remembered that Kubica was re-creating the partnership he had had with Neville a few years earlier. He would inevitably be expected to perform the same duties he had undertaken then. If the government were unable to do as much as it in fact did, the entire operation directed against Neville would have been impossible.

Why the government was willing to use Kubica in this way in order to reach Neville is unclear. The majority appears to be of the view that Kubica, with his chemical expertise, was the more valuable catch and the more logical target for hard nosed prosecution.[23] This may well be the case. But I am reluctant to second-guess the DEA choice of target. Neville, after all, was able to provide both money and "contacts." It cannot be said with any certainty that such a person may not ultimately prove more important than a chemist in breaking up

"unwary criminals," not "unwary innocents." *See United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (quoting *Sherman*); *Willis v. United States*, 530 F.2d 308 (8th Cir. 1976).

It is the entrapment defense, not the due process clause, that comes into play if the government "implant[s] the criminal design in the mind of the defendant." 411 U.S. at 436, 93 S.Ct. at 1645. *See* note 2 *supra*. But that defense was unsuccessful here. Although Kubica suggested the renewal of their previous activity, there is no evidence that he needed to persuade Neville, through continued blandishments or appeals to personal friendship. The "instigation" complained of here seems no greater than that discussed by Mr. Justice Holmes in *Casey, supra* n. 17. Kubica's phone call was "a simple request" to which Neville "seems to have acceded without hesitation and as a matter of course." *Id.*

19. *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973).

20. 425 U.S. at 495 n. 7, 96 S.Ct. at 1653.

21. *See* J. Wilson, *The Investigators* (1978). A recent commentator summarized one of Professor Wilson's observations:

Professor Wilson shows that the work of the FBI agents, differs sharply from that of their DEA counterparts. Because the former, for the most part, *investigate* crimes already committed and reported, their prime task is interviewing. DEA agents, on the other hand, have jurisdiction over consensual crimes, illegal drug transactions, which are rarely reported. Therefore the DEA agent must work under cover to *instigate* transactions under circumstances where evidence of the transaction can be produced. Skills needed by DEA agents are, therefore, not the same as those that best serve the FBI. DEA agents must learn to blend into the drug culture with the aid of criminals compensated by either cash or promise of prosecutive leniency.

Silberman, *Manager's Journal*, the Wall Street Journal, Sept. 11, 1978, at 24.

22. Moreover, even if I were persuaded by the majority's argument as to defendant Neville, I would reject their conclusion as to defendant Twigg. There was no government inducement of Twigg at all. He was brought into the crime by Neville. Instigation by a private person has never been a defense to criminal charges. Nor have the other facts stressed by the majority, Twigg's relative unimportance to the overall scheme, the likelihood that he would not share in the proceeds and his motives for undertaking the crime, traditionally been thought to constitute defenses to charges of criminal activity. On these facts I cannot believe that Twigg has even a colorable claim of either entrapment or overinvolvement.

23. Majority opinion, *supra* at 381 n. 9.

the network of drug manufacturers and suppliers in this country.

Whatever our judgment of their wisdom may be, DEA officials chose to utilize Kubica to pursue Neville. Given this decision, as a practical matter, they had to furnish through Kubica the same skills and materials Kubica had provided in the earlier conspiracy. This they did; and Neville, and through Neville, Twigg, willingly participated in the conspiracy. Although there is reason to question this sort of law enforcement, I cannot say that it shocks my conscience or that it reaches a demonstrable level of outrageousness beyond my toleration. This is so in part because I recognize the difficulties faced by the DEA in combatting the spread of illegal drugs. But, more importantly, I am particularly mindful of *Russell*'s warning that the federal judiciary is not to exercise " 'a Chancellor's foot' veto over law enforcement practices of which it [does] not approve." [24] To broaden the limited exception fashioned by Mr. Justice Powell in *Hampton* may well have just such an effect. Because I believe that that opinion authorizes judicial intervention under the due process clause only in extreme cases, I must respectfully dissent from the majority's reversal of the convictions of both Neville and Twigg.

---

**24.** 411 U.S. at 435, 93 S.Ct. at 1644.