**Winifred HARRISON, Petitioner,**

v.

**Delores J. BAYLOR, and the Attorney General of the State of Delaware, Respondents.**

**Civ. A. No. 82–275.**

United States District Court, D. Delaware.

Sept. 27, 1982.

---

Brian P. Murphy, Middletown, Del. for petitioner.

Alex J. Smalls, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for respondents.

**OPINION ·**

STAPLETON, District Judge:

Petitioner Winifred Harrison was charged with two counts each of violating the Delaware criminal statutes relating to receiving a bribe, delivery of a non-narcotic schedule controlled substance, conspiracy second degree, official misconduct, and promoting prison contraband.[1] Following a trial in the Superior court of New Castle County, the jury found the petitioner guilty of all the offenses charged. Thereafter, petitioner's motion for acquittal was denied by the trial judge and she was sentenced to six months imprisonment followed by four and one-half years of probation. An appeal was taken to the Delaware Supreme Court which affirmed petitioner's convictions.[2] This proceeding under 28 U.S.C. § 2254 followed.

I.

The charges against petitioner resulted from a Delaware State Police undercover operation at the Delaware Correctional Center where she was employed as a corrections officer. This operation was undertaken on the basis of evidence indicating that contraband, particularly drugs, was being smuggled into the prison. At that time, petitioner was thirty-two years of age, married with one child, and had no criminal record.

The police were assisted in their operation by a prisoner, John Barlow, who volunteered to approach guards rumored to be bringing drugs into the prison and to attempt to have them smuggle in drugs for him in return for a $100 cash payment. Barlow testified that he approached Harrison because she was bringing food into the prison which was technical contraband, and therefore, in violation of prison rules and 11 Del.C. § 1256. Barlow further testified

1. The corresponding provisions of the Delaware Code are as follows: 11 Del.C. § 1203; 16 Del.C. § 4752; 11 Del.C. § 512; 11 Del.C. § 1211; 11 Del.C. § 1256.

2. *Harrison v. State,* 442 A.2d 1377 (Del.1982).

that when he contacted petitioner and suggested smuggling marijuana into the prison for him, she agreed to the task without any threats or pressure and with no more than two hours of deliberation. Petitioner testified that Barlow repeated his requests numerous times and that he persisted in giving her the telephone number of the outside contact despite her efforts to put him off. Police Officer Dennis, who acted as the outside contact, testified that petitioner telephoned him twice and that three meetings were arranged. Two of these meetings actually took place: one at a rest stop on a main highway near Smyrna, and the other at petitioner's home. At each meeting, according to Dennis' testimony, petitioner appeared nervous and was given the opportunity to withdraw. Despite this opportunity, and without any pressure from Dennis, petitioner accepted the two ounces of marijuana on each occasion and was paid $100. Petitioner then took the marijuana into the prison, hid it under a heater in the guard's bathroom, unlocked the door and informed Barlow so that he could retrieve it. On the basis of this testimony, the jury found petitioner guilty of the offenses charged. By doing so, the jury rejected petitioner's entrapment defense.

## II.

■ Petitioner raises two issues in this Court, describing each as a "due process" issue. First, she maintains that when a defendant relies upon an entrapment defense which focuses on the defendant's predisposition to crime or lack thereof,[3] the relevant point at which the defendant's state of mind must be evaluated is the point immediately prior to the solicitation by state agents. If petitioner means by this assertion that a finding of predisposition cannot stand in the absence of evidence providing a rational basis for a conclusion that the defendant would not have committed this kind of criminal activity without the state sponsored inducement, her view is consistent with that taken by most courts. *See, e.g., United States v. West,* 511 F.2d 1083, 1086 (3d Cir. 1975). I believe it is also consistent with the position taken by the Supreme Court of Delaware in petitioner's case. While petitioner points to portions of the opinion of the Supreme Court of Delaware which she reads as taking a different view, those segments hold only that evidence of post-solicitation conduct of the defendant may support an inference of predisposition. Even assuming this to be a matter of constitutional significance, I can find no fault with this proposition or with its application to petitioner's case. The probative value of the evidence that petitioner exhibited little reluctance or hesitation in seizing the opportunity once offered, for example, forcefully illustrates the point.

## III.

■ Petitioner also asserts that, regardless of the jury's rejection of her entrapment defense, her conviction cannot stand because the police conduct in this case was sufficiently egregious to constitute a violation of her right to due process of law. As petitioner stresses, quite apart from any issue of entrapment, "fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was outrageous." *United States v. Jannotti,* 673 F.2d 578, 607 (3d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). In petitioner's view, the conduct of Delaware's law enforcement officers and their agent was outrageous in her case because they suggested that she smuggle marijuana into the prison for profit without any solicitation on her part and because they provided both the source on the outside and the recipient on the inside. I conclude, however, that these complained of activities did not violate the due process clause.

---

**3.** Petitioner relied on 11 Del.C. § 432 which provides that the affirmative defense of entrapment is available where there exists "wrongdoing of the officer [who] originates the idea of the crime and then induces the other person to engage in conduct constituting such a crime when the other person is not otherwise disposed to do so." A defendant relying on this provision has the burden of proving the essential elements of the defense by a preponderance of the evidence.

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the defendant was convicted of selling narcotics to government agents. He requested a jury instruction that he could not be convicted if the jury found that the government was the source of the narcotics as well as the purchaser. The Supreme Court upheld the trial court's refusal to give such an instruction. It is apparent from the opinions in that case that a majority of the Court does not regard the government's being on both sides of a narcotics transaction as a *per se* violation of due process. It follows, in my judgment, that the government's being on both ends of petitioner's smuggling scheme does not, in and of itself, require that her conviction be vacated.

Petitioner correctly notes that the procedural posture of the *Hampton* case before the Supreme Court was such that it did not pose the issue of whether government initiation of the idea of engaging in criminal activity, when coupled with the government's being on both sides of the illicit transaction, violates due process. She thus distinguishes *Hampton* on the ground that the state not only facilitated her crimes from both inside and outside the prison but also conceived of those crimes and suggested them to her. She urges that this makes her case different from those cases in which the government has facilitated an illegal enterprise which began before the government agents appeared on the scene.[4]

Petitioner finds support in *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978) for the emphasis which she places on government initiation. In that case, the government suggested to the defendant the establishment of a "speed" laboratory and gratuitously proceeded to supply about twenty percent of the glassware and the indispensable ingredient, phenol 2 propanone. The majority of the panel found this conduct to be a violation of due process. Its opinion stressed that the agents had not only supplied necessary ingredients but had also "conceived and contrived" the crime itself. 588 F.2d at 378. I believe, however, that the *Twigg* case can no longer be read as broadly as petitioner reads it after the decision of the Third Circuit Court of Appeals in *United States v. Jannotti,* 673 F.2d 578 (3d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Specifically, I believe the *Jannotti* case establishes three propositions which limit the scope of *Twigg* and which are helpful to the resolution of this case.

First, our Court of Appeals held in *Jannotti,* following the lead of the Second Circuit in *United States v. Myers,* 635 F.2d 932 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980), that government agents may properly propose a criminal transaction to an individual without having a reasonable basis to suspect that he or she is engaging in wrongdoing. *Jannotti,* 673 F.2d at 609. The second, and related, proposition which emerges from the *Jannotti* opinion is that the significance of the government's initiation of the idea for the crime is simply one factor to be considered in determining whether the government's overall participation is sufficiently pervasive to rise to the level of conduct "shocking to the universal sense of justice." *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). Finally, *Jannotti* stresses that any judgment with respect to the character of the government's conduct must be made in the context of the particular law enforcement problem facing the state's agents.[5]

---

**4.** The dissenters in *Hampton* similarly distinguish *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) on the ground that "the defendant in *Russell* 'was an active participant in an illegal drug manufacturing enterprise which began before the government agent appeared on the scene.'" 425 U.S. at 498, 96 S.Ct. at 1654.

**5.** Petitioner suggests that, if the police had truly been after those already engaged in the smuggling, there would have been no need to provide a source of marijuana. The police were under no obligation to assume, however, that the offending guards were not simply operating as messengers between prisoners and sources designated by them. Moreover, the state may well have been motivated by a desire to have a witness for the prosecution other than an inmate.

In this case, the law enforcement officers were confronted with a grave and potentially explosive situation; drugs were being smuggled into a prison population. The officers knew that there were ongoing illegal activities, but had no way of knowing at the outset who was conducting them. Those involved were necessarily operating under the perpetual scrutiny of prison security personnel, and, accordingly, were conducting their affairs in a highly clandestine manner. Concluding that an undercover operation provided the best hope of identifying those responsible for this breach of security, the officers provided an opportunity to smuggle to those who were rumored to be involved.[6]

In petitioner's case, the law enforcement officers did considerably less "conceiving and contriving" of the crimes committed than did the F.B.I. in *Jannotti*. They suggested to petitioner the possibility of smuggling marijuana for profit, but they did not present her with a ready made scheme for accomplishing that objective. Petitioner conceived the *modus operandi* entirely on her own. The core of her offense was the use of her public employment for private gain to transport contraband through the prison security. The government officers did not participate in any way in this activity. Just as the F.B.I. in *Jannotti* "merely created the fiction that it sought to buy the commodity—influence—that the defendants proclaimed they ... possessed," 673 F.2d at 608, the officers here simply created the fiction that they sought to buy the prison access which petitioner possessed by virtue of her position. I cannot say that their decision to do so under the circumstances is shocking to the conscience.

Because the participation of the State in petitioner's crimes was as limited as it was and because the frequency and intensity of the State's inducements were as low as they were even on petitioner's version of the facts,[7] a decision in petitioner's favor would necessarily rest on a factual conclusion that the police had no reasonable grounds to suspect that petitioner was involved in smuggling drugs into the prison and that this fact rendered their conduct outrageous as a matter of law. As earlier indicated, I read the *Jannotti* case as rejecting the legal premise of that argument.

Since I conclude that petitioner's rights under the United States Constitution have not been violated, the petition for a writ of habeas corpus will be denied.

---

**6.** The *Jannotti* court stressed, for example, that:

> Official corruption, in the form of bribery ... involving public officials, can, like the narcotics sales involved in *Hampton*, easily elude detection, since both parties to the transaction have an interest in concealment. Indeed, bribery may be even more difficult to uncover than drug deals.... A determination of what undercover operations are necessary to discover and expose corruptible public officials must be left, in the first instance, to that branch of government which

has the responsibility for maintenance of public order.

673 F.2d at 609 (citations omitted). A similar observation can be made about the law enforcement problems relating to the smuggling of contraband into a correctional institution.

**7.** While petitioner's brief at one point appears to argue to the contrary, even her account of her contact with Barlow and Dennis does not reveal inducements or pressures which would come anywhere close to presenting a due process issue.