UNITED STATES of America

v.

William BOCRA, Appellant.

No. 79–2271.

United States Court of Appeals,
Third Circuit.

Argued Feb. 21, 1980.

Decided May 29, 1980.

John R. Padova (argued), Solo, Padova & Lisi, Philadelphia, Pa., for appellant; Samuel V. Convery, Jr., Metuchen, N. J., of counsel.

Barry Ted Moskowitz (argued), Asst. U. S. Atty., Robert J. Del Tufo, U. S. Atty., Newark, N. J., for appellee.

Before ROSENN and SLOVITER, Circuit Judges, and LAYTON, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Appellant William Bocra was convicted of bribing an agent of the Internal Revenue Service (IRS) in violation of 18 U.S.C. § 201(b) (1976)[1] and was sentenced to a three-year prison term. At trial, Bocra's main defense was that he was the victim of entrapment by the IRS agent. In this direct appeal from the imposition of sentence, 28 U.S.C. § 1291 (1976), Bocra charges, *inter alia*, that he was denied a fair trial because the trial judge refused to allow him to introduce either as direct evidence or by cross-examination for impeachment purposes, the IRS agent's involvement in a number of other cases in which taxpayers were charged with attempting to bribe him in violation of section 201(b). We affirm.

### I.

This case arose out of the audit of two companies owned and operated by the William Bocra family. William Bocra was president of BBT Maintenance, Inc. (BBT) and vice-president of Perth Amboy Iron Works (Perth Amboy). The 1976 corporate income tax return of BBT became the subject of an IRS audit and in February 1978, Arthur Lemp, an IRS agent, was assigned to the case. Lemp, in the course of his

---

* Honorable Caleb R. Layton, 3rd Senior United States District Judge for the District of Delaware, sitting by designation.

1. 18 U.S.C. § 201(b) (1976):
   Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . or offers or promises any public official . . . to give anything of value to any other person or entity with intent—
   (1) to influence any official act; or
   (2) to influence such public official . . . to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
   (3) to induce such public official . . . to do or [not] to do any act in violation of his lawful duty. . . .

       *    *    *    *    *    *

   Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, . . . .

audit, examined various BBT records and discovered that Perth Amboy was a related corporation. He then determined that it would also be necessary to audit the Perth Amboy return for the fiscal year ending May 31, 1977. This audit, however, was not commenced until August 1978.

It was during the course of the Perth Amboy audit that Lemp began to develop a personal relationship with Bocra, his family, and the company accountant. On August 1, 1978, Lemp commenced his Perth Amboy audit and met Theodore Bocra (Theodore), appellant's brother for the first time. Lemp accompanied Theodore and William Platter (Platter), the company accountant, to lunch on the first day of the audit. Theodore suggested to Lemp that they play golf sometime but Lemp declined the invitation due to the ongoing audit. Theodore paid for the lunch except for a tip which Lemp left.

Lemp's audit of Perth Amboy uncovered a financial relationship with a restaurant known as Farrington Manor (the Manor) owned by the Bocra family. Lemp requested a list of shareholders of the Manor and a list of loans which Perth Amboy had made to it. William Bocra asserted that Perth Amboy had done some construction work for the Manor but that it had been done on weekends using only scrap materials. Lemp was interested in obtaining documentation of expenses deducted by Perth Amboy in connection with the construction, but never received the desired information.

The evidence at this point is sharply disputed by the parties. At an August 7, 1978 meeting with William and Theodore Bocra and Platter, Lemp claims the Bocras requested him to go easy on them in the audit. Both Theodore and William Bocra vigorously denied any request for favorable treatment. Lemp and Platter ate lunch together but Lemp paid his share. William Bocra subsequently invited Lemp and his wife as his guests to dinner at the Farrington Manor on August 11. The parties dispute whether William or Lemp initiated this invitation but Lemp tentatively agreed to the dinner. Lemp, however, immediately notified the IRS Inspection Service, which has jurisdiction over attempted bribes, and reported the dinner invitation. He was instructed to attend the dinner and report any attempted bribes. The dinner party, however, was cancelled due to William Bocra's illness.

Lemp continued his audit of Perth Amboy and revisited the company on August 30, 1978. Bocra instructed Platter to take Lemp to lunch at the Farrington Manor which Lemp says he accepted because he wanted to examine the construction performed by Perth Amboy and because the IRS had requested him to continue to monitor any bribe attempts. Lemp received no bill for the lunch. Lemp agreed to continue the audit at Platter's office to reduce the time required for the audit.

Due to delays in locating records, however, Lemp did not resume the audit until November 9, 1978, when he returned to Perth Amboy's office. There he met Theodore who told him that the necessary records were at Platter's office. Lemp remained at Perth Amboy, however, for the bulk of the morning and talked with Theodore. The parties sharply dispute the conversation. Theodore claimed he told Lemp about an article in a newspaper concerning dishonest government employees, which greatly upset Lemp. Lemp's version of the conversation suggested that this conversation manifested Theodore's interest in offering a bribe.

Theodore invited Lemp to lunch. Before lunch, Lemp asked him if he could fix a broken tire iron which Theodore agreed to do. At lunch, Lemp claims Theodore again requested easy treatment and that he would like a "no change" report.[2] Lemp stated he had no reason to make such a recommendation. Lemp testified that Theodore then asked him to discuss the matter with William and suggested a dinner party at Far-

---

**2.** A "no change" report is one in which the auditor recommends that no additional tax is owed.

rington Manor the next night. The remainder of the luncheon conversation centered on Lemp's sailing avocation and Theodore expressed a desire to learn how to sail with a corresponding invitation to Lemp to use his boat in exchange for lessons. Theodore's version of the conversation was that Lemp clearly indicated that he wanted a boat. Theodore claimed that he told William Bocra after this conversation that Lemp was trying to "shake them down."

Lemp reported the renewed dinner invitation to the IRS Inspection Service and submitted an affidavit detailing his conversation with Theodore. Lemp and his wife attended the dinner on November 10 as William Bocra's guests. Lemp agreed with the Inspection Service to wear a concealed tape recorder and transmitter to the dinner. No conversation relating to a bribe occurred at dinner. William Bocra, however, suggested to Lemp that they take an after-dinner stroll around the grounds. In the course of their stroll, William and Lemp discussed the audit with Lemp informing him that only $5,000 was owed on the BBT audit. Bocra told Lemp how he could not afford any financial difficulty at the time. Lemp then recounted his conversation with Theodore the day before and asked William what he wanted to do. After warning Lemp about the potential serious consequences of their conversation, William suggested that Lemp might like a boat. Lemp recounted the conversation he had with Theodore about the sailboat. Bocra said he would get Lemp a boat or whatever else he wanted if Lemp helped Theodore out on the audit. Lemp stated he could not recommend a no change report. Bocra then suggested an audit result of a small tax owed and offered Lemp $2,500 for this result. Lemp indicated that he would accept. Bocra again emphasized the seriousness of the conversation and Lemp manifested his understanding that it was a crime to give and receive a bribe. The two agreed to meet on November 17 at which time Lemp was to have the audit report completed.

Lemp reported the bribe offer to the IRS Inspection Service. On November 17 Lemp arrived at Bocra's Perth Amboy office and presented the requested favorable audit report. Bocra signed the audit report and signed a check for the small sum owed. Bocra then took Lemp for a short drive and indicated that the $2,500 was placed behind the sunvisor. Lemp took the money and immediately turned it over to the IRS Inspection Service.

William Bocra was indicted on March 16, 1979, on bribery charges under 18 U.S.C. § 201(b)(1). Bocra's defense was that Lemp had entrapped him into making the bribe. Defense counsel was aware that Lemp had been involved in other bribery cases arising out of taxpayer audits and filed a pretrial discovery motion for a summary of all other bribe attempts involving Lemp. The defense sought access to these materials in an effort to establish that Lemp had been the solicitor and William Bocra the innocent victim of an entrapment. The motion was opposed by the United States Attorney on the ground that the requested material was collateral and that except in three pending cases, the taxpayers had each pled guilty to bribery. The prosecutor submitted the materials to the court for *in camera* inspection and filed a motion *in limine* seeking to preclude Bocra from mentioning the other bribe cases involving Lemp.

The district court ruled that under *United States v. McClure*, 546 F.2d 670 (5th Cir. 1977), evidence of a systematic campaign of inducements to commit crimes was admissible to negate criminal intent. Because the material sought by Bocra related directly to his entrapment defense, the court ordered that copies of all IRS files involving bribery cases in which Lemp was involved and an indictment returned be turned over to the defense by June 25, 1979. He also ordered the Government to produce three files for *in camera* inspection relating to bribery cases involving Lemp in which no indictment had yet been returned. The court, however, indicated that the Government was free to file for a protective order for the IRS material, which the Government promptly filed. After completing his *in camera* inspection of the newly submitted material, Trial Judge Coolahan ordered that

the defense receive only two reports concerning Lemp and other bribes, but did advise the defense that some of the materials submitted *in camera* also related to a bribery case involving Lemp. This material revealed that Lemp had been involved in several other bribe cases. The judge also granted the Government's motion for a protective order for the rest of the material.

Trial commenced on June 27, 1979. The court issued a bench opinion granting the Government's motion *in limine* to prohibit the defense from using the information relating to other bribery cases and Lemp. The court ruled that the evidence at that time fell short of showing a systematic campaign of solicitation, a prerequisite for admissibility under Fed.R.Evid. 404(b), and that the probative value of the evidence was outweighed by the potential jury confusion resulting from exploration of collateral issues under rule 403. The court left open the possibility for the defense to proffer testimony relating to the other Lemp bribe cases to establish relevancy. Bocra did proffer the testimony of two taxpayers who had pled guilty to bribing Lemp, but after hearing it out of the presence of the jury, the trial judge ruled again that the evidence was inadmissible either as part of Bocra's case-in-chief or for purposes of impeaching Lemp. Bocra was subsequently convicted and this appeal followed.

## II.

Bocra raises numerous contentions on appeal. He contends principally that (1) the district court should have ruled as a matter of law that he was entrapped by Lemp; (2) the conduct of Lemp was so outrageous as to bar the conviction on fifth amendment due process grounds under our decision in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); and (3) the court erred in limiting discovery of Lemp's involvement with other bribery cases and in prohibiting the defense from introducing such evidence in its case-in-chief or on cross-examination of Lemp. We will first examine Bocra's evidentiary argument concerning the restrictions on his exploration of Lemp's involvement in other bribery cases. If the district court erred in this ruling, Bocra would have been denied an opportunity to present all of his evidence on entrapment to the jury. Only if the jury properly had all the evidence on entrapment before it, will it become necessary to examine Bocra's legal and constitutional contentions on entrapment.

The key to the successful establishment of an entrapment defense is proof that the defendant was not predisposed to commit the crime and that the criminal intent in fact originated with the Government. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). Bocra sought materials relating to Lemp's involvement with other taxpayer bribe cases to establish a pattern of solicitation by Lemp which would cast doubt on Bocra's predisposition to commit bribery. Bocra argues first that the district court erred in conducting an *in camera* inspection of the materials relating to the other bribery cases and that government files should have been turned over directly to the defense.

When defense counsel makes an appropriate discovery request, the Government must respond by turning over the materials directly to the defendant or to the trial judge. *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). The submission of discovery materials to the court for an *in camera* inspection and decision as to which materials are discoverable is commonly used when the Government's need for preserving confidentiality over the materials must be balanced with the defendant's constitutional right to evidence material to his defense. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976); *United States v. Scolnick*, 392 F.2d 320, 327 (3d Cir.), *cert. denied sub nom., Brooks v. United States*, 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968). In order

to overturn an *in camera* inspection, the defendant must show that the district court abused its discretion in denying access to requested materials. *United States v. Swanson*, 509 F.2d 1205, 1209 (8th Cir. 1975).

The Government sought to protect the confidentiality of the IRS files involving Lemp and taxpayers who were charged with bribery in other cases. Bocra claims it was error for the court to proceed to an *in camera* inspection because the questions involved in establishing entrapment are not susceptible to *in camera* review. He contends that only defense counsel can make a determination of which data are relevant to the defense. Bocra relies on *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), where the Supreme Court held that despite the Government's asserted confidentiality claim, *in camera* inspection of materials obtained by electronic surveillance was inappropriate. The Court stated: "[T]he task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case." *Id.* at 182, 89 S.Ct. at 971 (footnote omitted). However, the Court did note that it was speaking in terms of the unique complexity of electronic surveillance cases: "In both the volume of the material to be examined and the complexity and difficulty of the judgments involved, cases involving electronic surveillance will probably differ markedly from those situations in the criminal law where *in camera* procedures have been found acceptable to some extent." *Id.* at 182–83 n. 14, 89 S.Ct. at 971 n. 14.

■ We are not convinced that the issue of entrapment or the examination of prosecutorial evidence in non-electronic surveillance cases is so complex as to make *in camera* inspection inappropriate. The court is asked to review the materials with an eye to anything which might indicate that the intent to commit the bribery offense was implanted by the Government. Although such evidence may be subtle, we do not believe an able and experienced trial judge

was incapable of making an intelligent evaluation of the materials necessary to the defense. Under these circumstances, we cannot say the district court abused its discretion in conducting an *in camera* inspection of the government files relating to Lemp's involvement with other taxpayer bribe cases.

■ Nor do we believe the court erred in not releasing the bulk of the Government's files on Lemp's activities with other taxpayers. We have carefully inspected the *in camera* materials and have found *nothing* that indicates the district court erred in its rulings. Accordingly, we reject any suggestion that Bocra was denied materials critical to the presentation of his defense.

The district court did release two government files to Bocra. The Government filed a motion, however, to prohibit Bocra from introducing any evidence either on direct or cross-examination relating to Lemp's involvement with other taxpayers. It asserted that such evidence relating to Lemp's character was impermissible under Fed.R. Evid. 404(b) and that its probative value was outweighed by its prejudicial effect under Fed.R.Evid. 403. The trial court sustained the Government's position at the outset of the trial but left open the possibility that Bocra could make a proffer of the evidence implicating Lemp in other bribe cases. Such a proffer was made at the close of Bocra's cross-examination of Lemp. The proffered evidence consisted of the testimony of two taxpayers who had pled guilty to bribing Lemp. The Government renewed its objection to the introduction of this testimony. The court sustained the objection and ruled:

The proof provided and described fails to show that the defendant's alleged bribe of Agent Lemp was part of a systematic campaign of bribe solicitation by Agent Lemp. Accordingly, the proffered evidence does not fall within an exception of the general exclusion of Federal rule of evidence 404(b).

Additionally and previously noted, in the preliminary ruling on this motion, I further find that the marginal probative

value of the evidence does not outweigh the substantial risk that it would confuse the issues, mislead the jury, and consume undue time. Thus, the evidence should also be excluded under Federal rule of evidence 404 [sic].

Bocra asserts that the proffered testimony was admissible under Fed.R.Evid. 404 and that even if it is not, he should have at least been permitted to impeach Lemp's testimony through exploration of Lemp's involvement in the other taxpayer bribe cases.

The general evidentiary rule is that character evidence is inadmissible for purposes of showing that a person "acted in conformity therewith on a particular occasion." Fed.R.Evid. 404(a). An exception exists, however, when the character evidence is used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R. Evid. 404(b). The Fifth Circuit in *United States v. McClure, supra*, 546 F.2d at 672–73, held: "[Under Fed.R.Evid. 404(b)(2)] evidence of a systematic campaign of threats and intimidation against other persons is admissible to show lack of criminal intent by a defendant who claims to have been illegally coerced." Bocra maintains that the proffered testimony of the two taxpayers who bribed Lemp was evidence of a systematic campaign by Lemp of soliciting taxpayer bribes thereby negating any predisposition on Bocra's part to bribe Lemp.

■ Although Bocra's desired use of the proffered testimony under rule 404(b) appears superficially plausible, a close examination of the proffered evidence reveals that the district court did not abuse its discretion in excluding the proffered testimony. Both witnesses were unable to testify that it was Lemp who solicited the bribe.[3] Neither presented an entrapment defense as both pled guilty to bribing Lemp. We have carefully examined the proffered testimony and agree with the district court that it is legally insufficient to establish a scheme of solicitation of taxpayer bribes by Lemp. At best, the testimony raises a mere speculative inference that because Lemp was involved in other bribery cases, he was a solicitor of bribes. We see nothing concrete in the record to establish Lemp's role as such and agree that the marginal probative value of the proffered testimony was outweighed by the risks of jury confusion which would result from Bocra's collateral evidentiary excursion into Lemp's involvement with other taxpayers. Accordingly, we hold that the court did not err in barring Bocra from introducing the proffered testimony as part of his defense.

The district court's restriction on Bocra's cross-examination of Lemp, however, is more troublesome. Bocra also wanted to impeach Lemp's credibility by questions relating to Lemp's involvement in other cases. The district court banned any such cross-examination, apparently for the same reasons it excluded the proffered testimony as part of Bocra's defense.

■ The governing rule of evidence is Fed.R.Evid. 608(b) which provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness. . . .

This rule would permit Bocra to question Lemp about the other taxpayer bribe cases, if the court in the exercise of its discretion determined that they were probative of Lemp's truthfulness or untruthfulness.

---

3. The first witness, Costello, testified on cross-examination:

Q. To be frank with us, Mr. Costello, you can't remember who first brought up about paying Agent Lemp money; is that correct? A. I wouldn't be telling the truth if I said I did or he did.

Bocra's second witness, Peirano, was able to testify only that Lemp's silence made him believe a bribe was a possibility and that in fact it was Peirano's accountant who first brought up a bribe possibility.

Under no circumstances would Bocra be able to introduce the proffered testimony of the two taxpayers for impeachment purposes without violating the extrinsic evidence prohibition of the rule. If Lemp denied soliciting other taxpayer bribes, Bocra would have to "take his answer" and would not be able to introduce rebuttal testimony. *See Carter v. Hewitt*, 617 F.2d 961, 969 (3d Cir. 1980); *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976); 3 Weinstein's Evidence ¶ 608[05] at 608–22 (1979).

We must consider whether the district court abused its discretion in prohibiting Bocra from cross-examining Lemp as to his involvement with the other taxpayers. Weinstein states: "Since Rule 608(b) is intended to be restrictive . . . the inquiry on cross-examination should be limited to . . . specific modes of conduct which are generally agreed to indicate a lack of truthfulness." 3 Weinstein, *supra* ¶ 608[05] at 608–28. The Advisory Committee note to Rule 608(b) comments:

> Particular instances of conduct . . . may be inquired into on cross-examination of the principal witness himself . . . . Effective cross-examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial. Consequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite . . . . Also, the overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury . . . .

From the foregoing, it is evident that the type of inquiry into specific conduct of the witness for impeachment purposes is quite limited.

The classic example of a permissible inquiry would be an incident in which the witness had lied. Bocra, however, does not desire to journey into Lemp's involvement with other taxpayers for purposes of evaluating his untruthfulness, but rather to show

that Lemp was a solicitor of bribes. There is no allegation that Lemp was untruthful in the other bribery cases. At best a speculative inference would be raised that Lemp was involved in too many bribe cases to make the charge that he solicited the bribes unwarranted. We see any cross-examination of Lemp with respect to his involvement with other taxpayer bribes as only marginally probative of truthfulness. Indeed, Bocra seeks to establish through cross-examination that which has been ruled inadmissible on direct—namely that Lemp was involved in a pattern of solicitations. Rule 608(b) is meant to tie into Rule 403 and we believe the district court could have appropriately concluded that the probative value of the cross-examination was outweighed by the risk of confusing the jury by collateral exploration. We therefore cannot say that the trial judge abused his discretion in refusing to allow Bocra to cross-examine Lemp about the other bribery cases.

## III.

Our conclusion that Bocra was not erroneously deprived of the use of evidence relating to his entrapment defense requires us to explore whether on the evidence, the district court should have directed a judgment of acquittal on grounds of entrapment.

We are asked to consider whether Bocra was entrapped as a matter of law. In order to defeat an entrapment defense, the Government must prove beyond a reasonable doubt that it did not initiate the crime or that the defendant was predisposed to commit it. The key inquiry is a subjective one; did the intent to commit a crime originate with the defendant or with the Government? The Supreme Court has held:

> [T]he fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. . . . The appropriate object of this permitted activity, frequently es-

sential to the enforcement of the law, is to reveal the criminal design; . . . . A different question is presented when a criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they prosecute.

*Sorrells v. United States,* 287 U.S. 435, 441–42, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932). The Court has on several occasions reaffirmed this subjective focus on the defendant's predisposition to commit the crime as the essential element of the entrapment defense. *See, e. g., Hampton, supra; United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

The determination of where a criminal intent originates, however, is at times difficult, particularly when the Government takes an active role in cultivating the opportunities in which the defendant's criminal intent is allowed to gestate. As Chief Justice Warren stated in *Sherman, supra,* 356 U.S. at 372, 78 S.Ct. at 821, "a line must be drawn between the trap for the unwary innocent and a trap for the unwary criminal." In *Sherman,* the Court reversed a narcotics conviction because a government informant had persuaded the defendant, who had been attempting to avoid narcotics, to obtain for him a source of drugs. The Court in overturning the conviction stated: "[T]he Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this." *Id.* at 376, 78 S.Ct. at 822.

We must accordingly consider whether Bocra possessed an independent criminal disposition to bribe Lemp or whether Lemp in fact induced Bocra to make a bribe he otherwise would not have made. The evidence was highly disputed at trial. Lemp's version of the facts was that Bocra, by providing free lunches and requesting favorable tax treatment, clearly indicated a predisposition to commit bribery. Lemp merely created the opportunity for Bocra to proffer the bribe. Bocra's version was that Lemp carefully and purposely set him up by developing a personal relationship and by making direct overtures indicating his interest in taking a bribe.

■ The question of entrapment depended essentially on the credibility of the witnesses and was properly submitted to the jury which rejected Bocra's defense. Although we believe the question is close and troublesome, we have made a thorough review of the evidence in this case, and we cannot say that as a matter of law the evidence established entrapment. The jury was in the best position to evaluate the credibility of the witnesses, and they quite properly could have rejected Bocra's version of the facts in favor of the version recounted by Lemp. We therefore hold that the defendant has not shown entrapment as a matter of law.

## IV.

■ Bocra argues that the conduct of Lemp was so egregious that a conviction is barred by the fifth amendment's guarantee of due process of law. He relies on our decision in *Twigg, supra,* 588 F.2d at 378–79, which indicated that "although proof of predisposition to commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was 'outrageous.'" Bocra asserts that the IRS' conduct here, especially since the tax audit was discontinued following the bribe, was so outrageous as to violate due process notions of fundamental fairness.

Bocra's complaint is that Lemp approached him when he had no involvement in any criminal activity, and in essence, Lemp manufactured a crime without any reason to believe that Bocra was about to engage in any criminal activity. He claims that Lemp calculatedly used the IRS audit powers to delay the audit, thereby placing a great strain on the Bocras which was exploited through subtle suggestions that favorable tax treatment could be available at a price.

The Government responds by arguing that Lemp's conduct simply did not rise to the level of the outrageousness found in *Twigg*. In *Twigg*, the facts were undisputed. A government informant approached the defendant with a scheme for illegal drug manufacturing which the defendant agreed to enter. The Government provided much of the materials necessary for the project and actively participated in the drug manufacture. In the instant case, there is no evidence that the audit was initiated to trap Bocra into making a bribe. The disputed facts at best reveal Lemp's willingness not to cut off any bribe attempt. Although Lemp did not actively discourage a bribe, it is not clear from the record that he induced it.

We do not conclude that Lemp's behavior in this case was so outrageous as to bar conviction on due process grounds of fundamental fairness. We view his actions as significantly less egregious than the Government's activity in *Twigg*. We accordingly reject Bocra's claim that his conviction must be barred on due process grounds.

Nonetheless, we are disturbed by a course of governmental conduct here which appears to prey on the weaknesses of a taxpayer. The primary mission of the Internal Revenue Service is to collect federal taxes, not to encourage a taxpayer to commit crime. Our system of tax collection depends to a very large degree on taxpayer honesty. An attempt to avoid tax liability through bribery is indeed reprehensible, but certain aspects of the agent's conduct in this case also bear comment. Although we are constrained to conclude that Lemp's conduct does not bar the defendant's conviction under the prevailing federal rule of entrapment, we do not condone a government agent's conduct apparently calculated to raise a taxpayer's anxiety and to cultivate a climate for potential bribery. We see no reason why there should be undue delays in an audit accompanied by frequent social contact with the taxpayer. There is no justification for the development of a first-name relationship with the taxpayer in the course of an audit and the social involvement of the distaff side of the agent's and taxpayer's families to create an ambience which subjects even the honest taxpayer to unnecessary temptation. The agent's duty is to conduct his audit promptly, efficiently, and fairly, not to probe the lack or strength of the taxpayer's character.

### V.

Bocra raises several other contentions which we have examined and find to be without merit.[4] The judgment of the district court will be affirmed.

---

4. Bocra claims the district court erred in admitting evidence of Perth Amboy's tax deficiency as to show Bocra's motive to bribe; that the court erred in admitting for impeachment purposes evidence of a bribe by Theodore Bocra; that the court erred in allowing admission of his prior arrest for a barroom brawl.