**UNITED STATES of America**

v.

**Marion FERRELL, Karen Green.**

**Crim. A. No. 84–66.**

United States District Court,
E.D. Pennsylvania.

July 17, 1985.

Edward S.G. Dennis, Jr., U.S. Atty., Glenn B. Bronson, Asst. U.S. Atty., Philadelphia, Pa., for Government.

Barry H. Oxenburg, Neil I. Jokelson, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendants Marion Ferrell and Karen Green were convicted of distributing and conspiring to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846 (1982). Presently before the court are the post-trial motions of each defendant.[1]

Defendants complain that the court erroneously excluded extrinsic evidence about the drug activity of the government's chief witness, Ricardo Shabazz. Shabazz approached federal officials in May, 1983, and offered to assist them in their drug investigations in his neighborhood. Shabazz testified that he had agreed to help the federal agents because drug problems were tearing his community apart, and that people who were not directly involved in the drug activity "were starting to be victims of the drug problem." N.T. 62.

1. Because each defendant raises common issues, the motions will be considered together.

Shabazz stated that he and officer Alvin Williams of the Drug Enforcement Agency (DEA) planned to have Shabazz buy drugs from dealers known to him. N.T. 61–66. According to Shabazz, the following procedure was used on each of the four times, July 28, July 29, August 1, and August 30, 1983, that he obtained drugs from one or both of the defendants at Karen Green's home. Shabazz would be given cash by the DEA. DEA agents would then search him to see that he was not carrying drugs or other sums of money and would drive him to a location a few blocks from Karen Green's house. The agents would observe Shabazz as he proceeded on foot so they could corroborate that Shabazz did not procure the drugs from a source other than Green or Ferrell. After he had consummated a transaction, Shabazz would be searched again by the DEA agents.

Obviously, Shabazz's testimony was a crucial element of the government's case. Shabazz was subjected to lengthy and rigorous cross-examination, much of it about his personal life and background. He was asked about his nickname. N.T. 121, 129, 132, and 136. He was asked if he wore a fez. N.T. 121. He was asked if he used drugs. N.T. 120. He was asked if he had ever sold drugs. N.T. 120, 132, 136, and 188. He was asked if he had a reputation for selling drugs. N.T. 137, 201. He was asked if he had a beeper and the name of the company from which it was rented. N.T. 152, 189. He was asked if he had ever used a beeper to aid in drug transactions. N.T. 154. He was asked about his failure to file tax returns. N.T. 126, 130, and 132. He was asked about his prior employment, his earnings, education, change of name, and marital history. N.T. 123–138. He was asked about his being in the witness protection program and money that he had received from the government for his services. N.T. 134, 182–83. He was asked

extensively about the fact that his powers as a notary public had expired but he continued to do notary work nonetheless. N.T. 219–22. In addition, he was asked about the details of the various drug transactions. He revealed he had made 68 drug purchases from 20 persons for the DEA between May, 1983, and January, 1984. He was questioned as to his understanding about the officers who had him under surveillance, details concerning the conversations that were recorded, and his prior relationships with Green and Ferrell. Cross-examination was extensive and essentially unrestricted. Many of counsel's questions were mini-speeches to the jury, laced with sarcasm and augmented with innuendo. *See, e.g.,* N.T. 120, 124, 132, 155 & 188.

On cross-examination Shabazz explicitly stated that he had not used or sold drugs in the past. Having elicited this response, defense counsel then tried to destroy his credibility by offering evidence to the contrary. Specifically, defendants sought to introduce the testimony of three witnesses who would state that "prior to 1983 [Shabazz] was dealing drugs in the area in which the [defendants are] claimed to be active...." N.T. 4.145. When confronted with the limitations of Fed.R.Evid. 608 precluding such evidence, defense counsel resourcefully suggested other reasons why it should be received. My refusal to permit the evidence in question is assigned as error.[2]

Of course, the evidence was not admissible if offered solely to contradict Shabazz and thus impeach his credibility. When information is elicited by cross-examination on collateral matters, the cross-examiner must accept the witness' statements. This does not mean he cannot press for a different answer or be rigorous and searching. What it does mean is that he cannot offer testimony to the contrary. *See United States v. Bocra,* 623 F.2d 281,

---

**2.** Also alleged to be error was my exclusion of evidence that at one time Shabazz was arrested and found with $5,000 and a telephone beeper device, evidence that, after 1979, Shabazz was not a registered notary public, and evidence that the company from which Shabazz claimed he rented his beeper never leased a device to an individual named Ricardo Shabazz. This evidence was offered for the same purposes as the eyewitness testimony that I excluded. *See infra* note 7.

288 (3d Cir.1980); *Carter v. Hewitt,* 617 F.2d 961, 969 (3d Cir.1980). Fed.R.Evid. 608(b) provides:

> Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the Court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning his character for truthfulness or untruthfulness....

■ Defendants correctly assert that Rule 608 does not bar all extrinsic evidence that serves to impeach a witness. Rule 608 precludes evidence that is offered solely to prove that a witness has been untruthful. It does not limit a party's introducing extrinsic evidence that may have the *effect* of generally impugning a witness' credibility, but is offered for some other relevant purpose. *See United States v. James,* 609 F.2d 36, 45–48 (2d Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *United States v. Rios Ruiz,* 579 F.2d 670 (1st Cir.1978); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[01], at 9 (1982).

To establish error on my part, defendants, therefore, must have asserted some reason, other than attacking general credibility, for which the proffered evidence was relevant. Fed.R.Evid. 103(a)(2). They urge three such bases: (1) the evidence tends to show that Shabazz may have obtained the drugs which he turned over to the DEA agents from a source independent of the defendants; (2) the evidence shows Shabazz had an ulterior motive for participating in the investigation and testifying against the defendants; and (3) the evidence rebuts Shabazz's statement on direct

examination that he became involved in the investigation because of the adverse impact of drug trafficking in his neighborhood.

INDEPENDENT SOURCE

Defendant's first argument, that Shabazz may have had a source of drugs other than Ferrell and Green, is unpersuasive. The speculation that counsel wanted the jury to engage in—unfounded on any evidence—was that after Shabazz had been searched by DEA agents, he eluded their surveillance without their knowing it (even though he did not know just where any of them might be at a particular moment),[3] obtained drugs which he then attributed to innocent victims, among them Green and Ferrell, so he could remain on the government payroll. Just how he could have pulled off this feat of legerdemain was not even suggested, but it is the mainframe of the alternative source contention. The indictment charged, and the evidence showed, that Shabazz obtained drugs on four occasions between July 28 and August 30, 1983, from one or both of the defendants at Karen Green's house. The evidence which defendants sought to introduce was that of three witnesses, each of whom would testify that they knew Shabazz and "prior to 1983 he was dealing drugs in the area where the defendant is claimed to have been active as well, that is, the Richard Allen Homes and the surrounding areas." N.T. 4.145.[4]

■ Relevant evidence means evidence having any tendency to make the existence of a fact that is of consequence more probable or less probable than it would be without the evidence. Fed.R.Evid. 401. Obviously, the proffered testimony addressed a time which was at best seven to eight months before July 28, 1983. It could have

---

**3.** Shabazz testified he had been told he would be under constant surveillance. N.T. 157. He would have no way to know when he was not under surveillance. N.T. 252. He always assumed he was under constant surveillance. N.T. 157, 251.

**4.** Apparently defense counsel had not actually interviewed these witnesses because he stated

that this was his understanding of what they would say. He did not dispute the government's assertion that all they would say was that they had seen Shabazz standing on a street corner selling drugs at a time and place that is clearly remote from the issues here involved. N.T. 4.147.

been much more. Counsel conceded that they had no evidence that Shabazz possessed any drugs in July or August, 1983. N.T. 4.147. Counsel contended, however, that the evidence would be relevant to show that the drugs Shabazz said he obtained from Ferrell and Green did not come from either of them. Specifically, it was asserted that the jury should be able to consider whether Shabazz had alternative sources of drugs because he had been a drug dealer on prior occasions. N.T. 4.151. To state this argument is to reveal its fallacies. If the jury had accepted the testimony that Shabazz had been a drug dealer "prior to 1983," it would not increase the probabilities that he still had a source of drugs in July and August of 1983. It would not increase the probabilities that his source of drugs, wherever it may have been "prior to 1983," was in July and August 1983, in the vicinity of Karen Green's home. It would not increase the probabilities that if he had had a source of drugs in July and August of 1983 in the area where Karen Green lived that he would have obtained drugs there rather than from Green and Ferrell. In short, if Shabazz had been a drug dealer "prior to 1983" it does not lessen the probability that he bought drugs in July and August 1983 from Karen Green and Marion Ferrell.

Assuming for the sake of argument, however, that the evidence had a tendency, however slight, to establish that in July and August, 1983, Shabazz had an alternative source of drugs, the probative value would have been substantially outweighed by the danger of confusing the issues and misleading the jury. Fed.R.Evid. 403. The effect of receiving this evidence would have been to have a trial within the trial. Obviously, the credibility of the three witnesses would have been important and would have been subject to attack and counterattack. If the government had sought to introduce evidence to show that Shabazz did not have prior drug dealings, it would have been relevant. The focus would quickly have shifted from the guilt or innocence of the defendants to the collateral matters which Fed.R.Evid. 608(b) is intended to preclude.

There is no question about the fact that what counsel had planned to do right along was to impeach Shabazz's credibility by showing he was a liar. N.T. 148, 151. It was not until after counsel had additional time to think about the matter that they came up with the theory that Shabazz had an alternative source of drugs because he had been a drug dealer on prior occasions. N.T. 4.151. On the grounds of Rules 401, 403, and Rule 608(b) the offer was properly rejected.

The same argument mounted by defendants here was considered and rejected by the Ninth Circuit in *United States v. Norman*, 402 F.2d 73 (9th Cir.1968), a case decided before the present rules of evidence were adopted. In *Norman*, defendant was convicted of violating the narcotics laws. The government's case centered on the testimony of Porter White, a special employee of the government, who had made a purchase of heroin from the defendant. Procedures similar to the ones utilized by the DEA in this case were used in *Norman*. Defendant attempted to introduce the testimony of several individuals who would have stated that they had purchased narcotics from White, arguing that this evidence tended to show that White had an independent source of drugs. The district court excluded the evidence. The court of appeals affirmed, stressing that the probative value of the evidence was low and the risk of improperly shifting the jury's focus was high. *See id.* at 77.

MOTIVE

Defendants next contend that the proffered evidence was probative of Shabazz's "motive." First, they contend that the motive of a witness is *always* relevant, especially in a criminal trial. Second, they contend that motive became relevant when the prosecutor put it in issue by eliciting Shabazz's purpose in contacting the DEA.

Defendant's contention that the motive of a witness may be explored through extrinsic evidence is correct. In fact, the Supreme Court has observed that

the exposure of a witness's motivation in testifying is so significant that, in a criminal case, curtailment of examination of motive may amount to a denial of due process or the right to confrontation. *See Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974). However, "motive" as used in *Davis* and the cases cited by defendants, does not refer to the witness' general reasons for becoming involved in the controversy. Rather, the motive which must be brought to the jury's attention is the possible motive for a witness on the stand to lie or shade the truth. *See, e.g., id.* at 316–18, 94 S.Ct. at 1110–11 (confrontation clause required defense counsel to have the opportunity to cross-examine witness, who was on juvenile probation and may have had a motive to testify favorably to the prosecution); *United States v. Harvey,* 547 F.2d 720, 722–24 (2d Cir.1976) (error to exclude evidence that key government witness, who had once accused defendant of fathering her child, may have had a motive to testify falsely against the defendant); *United States v. Robinson,* 530 F.2d 1076, 1080 (D.C.Cir. 1976) (no error in admitting evidence that key defense witness may have had reason to testify favorably to defendant); J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 607[03], at 23–24 (1982) ("[s]ince bias of a witness is always significant in assessing credibility, the trier must be sufficiently informed of the underlying relationships, circumstances and influences operating on the witness so that, in light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probable human reaction).[5]

Consequently, counsel must have offered some theory which would have shown that Shabazz had a reason to lie, for which the proffered evidence was relevant. Counsel's theory is that Shabazz engaged in the DEA investigation in order to obtain money. Believing a steady flow of DEA funds would only be possible if he provided federal officials with numerous drug traffickers, Shabazz obtained drugs from a single source and then named numerous individuals, such as Ferrell and Green, as his suppliers.

Although counsel may have labeled this argument as one relating to motive, it is predicated on the same factual basis as their first argument—that Shabazz had a source of drugs independent of Green and Ferrell. For reasons already expressed, the offered evidence is insufficiently probative of that point. *See* Fed.R.Evid. 401, 403.

REBUTTAL

Counsel's final argument, that the evidence is admissible to rebut Shabazz's claimed reason for becoming involved in the DEA investigation, takes two forms. Their first argument is that Shabazz was not driven by a desire to eradicate a drug problem, but rather by a desire to obtain federal funds. This argument simply adds dressing to the motive argument that was previously rejected, and it must fail as well.

Counsel's alternative argument, that the evidence should have been admissible simply to rebut Shabazz's claimed reason for involvement, bears different analysis.

5. In the brief submitted on behalf of the defendants it is contended that the prosecution introduced a question of bias into the trial by asking Shabazz if he had any "personal beef" against the defendants. N.T. 250. Actually the question of *possible* bias was initially raised by the defense when, on cross examination, counsel inquired whether Shabazz ever owed Ferrell money for whitewall tires, N.T. 185, and whether Ferrell had ever demanded money from him. N.T. 186. Counsel also strongly implied that a pawn ticket he showed to Shabazz had been delivered by Shabazz to Ferrell as security for a debt Shabazz owed Ferrell. N.T. 187–88. It was also brought out on cross-examination that Shabazz had known Karen Green and her family "for years." N.T. 203–04. There was no objection to these questions, I was not asked to make a ruling, there was no offer of proof as required by Fed.R.Evid. 103, and there was no other evidence about bias or prejudice. Therefore, I do not know how anything about bias got into defendants' brief. I almost feel like Jack's mother. One day I had a cow and the next a big beanstalk—and I do not know where it came from.

Even if bias had been raised at trial, I fail to see how evidence of prior drug activity by Shabazz had any bearing on the issue of whether Shabazz had a "beef" with the defendants.

Counsel argues that a person who has sold drugs in the past would not be likely to take part in a drug investigation in order to protect the community.

Involved here is a question concerning the scope of permissible rebuttal testimony. Under the Federal Rules of Evidence, the trial court is accorded broad discretion to control the admission of rebuttal evidence. *See Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). In the Third Circuit, a two-step process has evolved to provide the district court with guidance in ruling on rebuttal questions. *See United States v. Pantone,* 609 F.2d 675, 681 (3d Cir.1979). *See also American Home Assurance Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321, 325 (3d Cir.1985). First, the court must determine to what extent the offered evidence rebuts the witness' prior assertion. *See Pantone,* 609 F.2d at 681. Next, under Rules 403 and 607, the court must balance the probative rebuttal value of the evidence against the danger of prejudice or confusion. *Id.*

In this case, the proffered evidence provides nothing of substance for rebuttal. The fact remains that the so-called rebuttal evidence speaks to some unknown time in the past. Numerous reasons could explain away any apparent discrepancy between Shabazz's statement that he contacted DEA officials in order to alleviate a drug problem in his community and the proffered testimony that Shabazz had been seen in the past distributing drugs. Most apparent is the possibility that some event had caused Shabazz to reform in the interim.

Again, the potential for confusion that might result from the introduction of this evidence under a rebuttal theory is great. The door would have been open to a full-scale trial of Shabazz's drug involvement and to any explanation for reform. The jury's attention would have been shifted improperly from the main event to a side show. As with counsel's other theories, the balance favors exclusion.[6] *See id.;* Fed.R.Civ.P. 403, 607; J. Weinsten & M. Berger, *Weinstein's Evidence* ¶ 607[05], at 67 (1982).

The need to give careful consideration to prejudice or confusion is magnified when the evidence offered in rebuttal would otherwise be barred by Rule 608(b). *Cf. Pantone,* 609 F.2d at 681 (prejudice must be carefully examined where offered rebuttal evidence would have been inadmissible under Rule 404(a) ).[7]

In sum, after detailed review of the record and the contentions made by the defendants, I am convinced that it was entirely proper for me to exclude the offered testimony.

Defendants other contentions are rejected without discussion.

---

**6.** I reach this conclusion fully cognizant of the fact that concerns underlying the confrontation clause, which may be present in the instant case, were not implicated in *Pantone.*

**7.** As has been stated, defendants object to my exclusion of the following: evidence that after 1979 Shabazz was no longer a registered notary, evidence that at one time Shabazz had been arrested and found carrying a large cash sum and a telephone beeper device, and evidence that the company from which Shabazz claimed he rented his beeper had no records of ever leasing a device to a Ricardo Shabazz.

Apparently, it is common practice among drug dealers to carry a beeper so that they can be contacted by prospective purchasers and suppliers. Shabazz testified that he rented the beeper so that he could be contacted to perform notarial services, tax work, and so that he could be available for his mother whom he claims had a heart condition.

As with the excluded testimony that Shabazz had been seen in the past dealing drugs, counsel first offered the evidence to show that Shabazz was a liar and then argued other purposes for which the evidence was relevant. Defendants contend that the evidence was admissible to show that Shabazz had no legitimate use for the beeper and that he was involved in drug trafficking. Even assuming that this argument was raised at trial, it is readily apparent that the evidence has even less probative value than the offered testimony that Shabazz had been seen dealing drugs prior to 1983 and was properly excluded.