643 So.2d 1166 (1994)
STATE of Florida, Appellant,
v.
Anthony and Ralph FINNO, Appellee.
No. 93-1019.
District Court of Appeal of Florida, Fourth District.
October 12, 1994.
*1167 Robert A. Butterworth, Atty. Gen., Tallahassee, and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellant.
Fred Haddad, Fort Lauderdale, for appellees.
WARNER, Judge.
In the state's appeal from the dismissal on the grounds of entrapment of an information filed against appellees charging them with loansharking, it claims that the trial court erred in its application of Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), and that State v. Munoz, 629 So.2d 90 (Fla. 1993), requires that we reverse and remand for trial. Appellees argue that the conduct of the government was both a violation of due process and would meet the subjective test of entrapment of Munoz. Based upon the record, we conclude that the trial court's order should be affirmed on both grounds.
In its brief and reply brief, the state concedes that the facts are amply stated in the trial court's order of dismissal and were never significantly disputed between the parties. Therefore, although we have not been favored with all of the transcripts and tapes available to the trial court, we accept the state's concession. Thus, we excerpt the trial court's order to set forth the facts.
The defendants in this case are charged with racketeering, conspiracy to racketeer, usury and related charges that resulted from a "loansharking" operation with which the defendants were alleged to be associated... . This order considers only the "loansharking-RICO" aspect of the case.
Agent Thomas Sullivan of the Florida Department of Law Enforcement was conducting and investigation of the "Botswana" Embassy on mission in the United States due to some allegations of fraud being conducted through their offices. Agent Sullivan discovered the principals of this fraud to be Eddie Wasco and John Russo [or Johnny Red], two persons Sullivan had previously arrested for racketeering activity. To save themselves substantial jail time after further investigation resulted in federal charges, Wasco and Red advised Sullivan that they had valuable information; to-wit: a plot to kill Sheriff Navarro by Ralph Finno, a retired Ft. Lauderdale police captain who was a candidate for sheriff, among other positions, and his brother Anthony, an electrical inspector from the City of Margate.
A certain investigation of Anthony, and tangentially Ralph, had been conducted relative to an alleged house of ill repute assertedly owned [but long closed] by Anthony which Sullivan testified was at best dormant. The police advised Red and Wasco to meet with the defendants and went through elaborate steps to video tape these meetings.
The videos depict a situation of a lot of talk, abject stupidity, and other ramblings. Until the last few tapes, nothing of a criminal *1168 nature is discussed. In fact, Ralph Finno refutes and disavows any desire or intent to kill Sheriff Navarro, the very basis for the elaborate investigation. Agent Sullivan admitted in testimony at trial, as further acknowledged at the hearing on the Sworn Motion to Dismiss, from March through 14 June there was no criminal activity of any kind going on.
.....
What occurred next was set out at trial:
Q. [By Mr. Haddad] Okay. We have no criminal activity as of June 13th for which an arrest has been made or an Indictment is returned?
A. No.
Q. I'm correct?
A. We have no criminal activity.
Q. And at that time, after your long investigation, we have had how many tapes, five or six, seven?
A. In that neighborhood, yes.
Q. Instead of dropping the investigation you decide to go into loansharking?
A. Why would I drop the investigation? That's my answer to you.
Q. You decide to go into loan sharking?
A. We do go into a loan sharking operation.
Q. The thought originated with you.
A. No, with Mr. Finno.
Q. Mr. Finno said on the tape that when he was a policeman, certain crimes didn't bother him?
A. That's right.
Q. Such as, extortion, gambling, prostitution or loansharking? He said prostitution and gambling?
A. That's right.
Q. You didn't set up a gambling thing?
A. No.
Q. You didn't set up any prostitution?
A. No.
Q. So whose idea was it to go to loansharking?
A. Mine, because it was easy to control as to what agents were receiving the money.
Q. The agents were the persons who were receiving the money?
A. Yes, sir.
Q. When we hear conversation about G.G. and Leslie and John and Bob and all these people that were getting money, they were getting it from whom?
A. FDLE.
Q. Who's the FDLE giving it too [sic]?
A. Wasco.
.....
Q. And before that plan went into effect, of course on the tapes we hear, on the June 14th tape, we hear Tony talking and Ralph talking about being broke, that they need money, Tony is asking for a $5,000 loan?
A. Yes.
Q. Ralph is saying that they've got to do something for him and they're suggesting they might have something for him at the Port Authority, correct?
A. Yes.
Q. And this screen unfolds to have them loan shark to collect monies, correct?
A. Yes.
Q. And the money is given from Wasco to the Finno brothers, one or the other?
A. Yes.
Q. The money goes from there to your agents?
A. Yes.
Q. The agents are paying this interest supposedly, correct?
A. Yes.
Thus, what is presented is that after months of investigation revealed no criminal activity, Agent Sullivan, based upon a philosophical remark by Ralph Finno as to his thoughts on what are classically considered "victimless crimes", decided to set up a loanshark operation. The tapes reveal, most cogently to the matter at bar, that Eddie Wasco, another government agent, had to "sit down and give lessons" to the Finnos on how to lend FDLE money to FDLE agents to receive FDLE interest in return so that they could then be arrested and charged. The agent admitted the loansharking scheme was his idea.

*1169 The state presented no evidence of ongoing criminal activity by the defendants, nor did it establish or suggest that Mr. Ralph Finno was engaged in criminal activity. Indeed, the opposite appears from the record. The video tape of Wasco telling the Finnos how to engage in the loanshark business belies the criminality the state would like to suggest.
.....
The police agents spent months with Ralph Finno offering every type of assistance on the one thing Ralph Finno cared about, clearing his name from a year earlier prostitution investigation that was hampering his political career. All in an effort to obtain statements in the purported "Navarro plot" after months of non activity, Agent Sullivan by his own admission and design decided to virtue test.
In State v. Munoz, the supreme court determined that the amendment of section 777.201, Florida Statutes, eliminated the objective test of entrapment which had been enunciated by the court in Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), and upon which the trial court had relied in dismissing the information. Except where the law enforcement conduct is so egregious as to constitute a due process violation under Article 1, Section 9, of the Florida Constitution, the subjective test for entrapment is to be applied. Appellees argue that the government conduct was indeed egregious.
Although in State v. Glosson, 462 So.2d 1082 (Fla. 1985), our supreme court rejected the narrow application of the due process defense of the federal courts, the conduct of the government in this case is outrageous even under the stricter federal standard of review. See United States v. Twigg, 588 F.2d 373 (3d Cir.1978); Greene v. United States, 454 F.2d 783 (9th Cir.1971). Where the government supplies all of the instrumentalities of a crime, controls all of its aspects, and teaches the intended target how to commit the crime for the purpose of arresting him, as the trial court found here, there is no crime at all without the government involvement. No legitimate objective of government is accomplished by prosecuting a crime so totally and completely orchestrated by the government. We conclude that this activity violates due process. Twigg. We affirm the trial court's dismissal.
Even if the conduct of the government did not violate due process, we think that this case must still be resolved by affirming the trial court in light of Munoz on subjective entrapment grounds. In order to prove the subjective test of entrapment, Munoz establishes three questions to be asked: (1) did an agent of the government induce the accused to commit the offense charged; (2) was the accused predisposed to commit the offense charged; and (3) should the case of entrapment be submitted to the jury. Munoz at 99-100. In the instant case, there is no question that the government induced the appellees to commit the offense. The state does not dispute this. As to the second point, the trial court mentioned appellee Ralph Finno's "philosophical remark ... as to his thoughts on what are classically considered `victimless crimes.'" That the defendant may philosophically or theoretically think that some act should not be criminal cannot amount to predisposition to commit the crime. To claim that is to say that a newspaper editor, for instance, is predisposed to commit drug crimes because the editor has argued for legalization of drugs. Such advocacy does not amount to criminal predisposition. Thus, appellee's lack of concern for victimless crimes does not amount to predisposition.
While the agents of the government had been investigating appellees for several months on unrelated charges, during that time the object of the government was not to set up any sting but to uncover what they had been informed was an existing plot. Once they established that no such plot existed, instead of abandoning the investigation, the agent of the government decided to see if he could interest appellees in other illegal activity. The trial court's order, which the state concedes contains the undisputed facts, concludes that the state presented no evidence showing that appellees were engaged in ongoing criminal activity of any type.
*1170 The evidence presented shows no independent information that appellees were predisposed to engage in loansharking. That fact is shown by their total ignorance of the activity to the point that government informants had to show them how to conduct a loansharking operation. And this was after months of conversations and dealings with defendants where no illegal activity of any kind was unearthed. Munoz requires that the state establish that the appellees were predisposed to undertake the offense "prior to and independent of the government's inducement." Id. at 95; citing Jacobson v. United States, ___ U.S. ___, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (emphasis supplied). While the issue of subjective entrapment is ordinarily a question for the jury, the Munoz court stated:
[I]f the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law because no factual `question of predisposition' is at issue.
Id. at 100. Given the undisputed material facts as set forth in the trial court's order and conceded by the state, the state presented no evidence of predisposition. Therefore, we conclude that appellees were entrapped as a matter of law.
Affirmed.
GUNTHER and POLEN, JJ., concur.