DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**JEROD HARPER,**
Appellee.

No. 4D17-1251

[September 5, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Edward H. Merrigan Jr., Judge; L.T. Case No. 14-14568 CF10A.

Pamela Jo Bondi, Attorney General, Tallahassee, and Matthew Steven Ocksrider, Assistant Attorney General, West Palm Beach, for appellant.

Antony P. Ryan, Regional Counsel, and Richard G. Bartmon and Joseph Kimok, Assistant Regional Counsels, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellee.

LEVINE, J.

In this case, we confront the contours of objective entrapment, which exists when governmental conduct is so "outrageous" as to violate established concepts of due process. We also examine subjective entrapment, which centers on whether the defendant was induced to commit the crime and whether the defendant had a lack of predisposition to commit the offense. We find no objective entrapment because law enforcement did not engage in such "outrageous" conduct to offend "decency or a sense of justice." We further find no subjective entrapment as a matter of law. Rather, the issue of subjective entrapment presented a question of fact that is properly for the jury. Therefore, we reverse the order dismissing charges against the defendant based on entrapment and remand for the trial court to reinstate the charges.

The Violent Intervention Proactive Enforcement Response unit ("Unit") of the Broward Sheriff's Office ("BSO") created the "Hotel Scenario" as part of a reverse sting operation. The Hotel Scenario involved the use of a

confidential informant ("CI") to identify people who were actively committing crimes. Once the Unit approved the subject of the investigation, the CI would tell the subject that she has a friend who cleans hotel rooms. The CI would then explain that, while cleaning a room that appeared to be occupied by drug dealers, the friend saw money, jewelry, and drugs, including a kilo of cocaine, in the safe. Next, the friend would offer to provide the room key for someone to commit a burglary, but did not want to be involved herself because she was known at the hotel. If the subject agreed to the burglary, the CI would inform the subject that the friend would drive them and show them the room.

The CI used in this case had a substantial assistance agreement with BSO. The defendant and the CI had known each other since middle school but had not seen each other in several years. The defendant found the CI on Facebook and initiated communications with her via text message.

The CI identified the defendant as a potential target and told the Unit that he had been actively committing burglaries. The Unit reviewed the defendant's criminal history. At the time the CI identified the defendant as a potential target, the defendant had recently been released from prison and was on probation for burglary of a dwelling, dealing in stolen property, and grand theft. The defendant also had a lengthy juvenile record involving burglary, narcotics, and theft.

After the Unit approved the defendant as a subject of this investigation, the CI presented the "Hotel Scenario" to the defendant through an exchange of text messages. The CI asked the defendant if he wanted to make a "kum up" with her, indicating that she wanted to commit a crime. The defendant asked what they had to do and how they were going to make the money. The CI responded that her friend who works in a motel found items in a safe. The defendant asked why the CI needed him, and she responded that she needed someone to lift the safe. The defendant asked what was in it for him. The CI responded a "[h]alf split" "[a]nd an entire day 2 chill wit me;-)."[1] The defendant said that he was in and asked what time. He also said that the CI would have to get him drunk first. The CI responded that he might have to take a few shots because "bizness iz bizness" for her. She then said that afterwards she would buy him drinks because she wanted to go out and celebrate since it was a lot of money. The defendant again stated that he was in. After confirming that the hotel did not have functioning cameras and that the CI would have a car, the defendant stated that he would be ready.

---

[1] The ;-) is an emoticon that is commonly understood to depict a "wink."

2

Over the next two weeks, the CI and the defendant continued to exchange text messages. The defendant asked on multiple occasions when they were going to commit the crime. The CI also confirmed on several occasions that the defendant still wanted to commit the crime. In one text message, the defendant told the CI that he wanted to perform a sexual act on the CI, and the CI responded, "Lmao," which is an abbreviation for "laughing my a-- off." After several more days of texts messages, the CI finally texted the defendant to ask if he was ready to commit the crime. He said he was.

The CI and her "housekeeper friend"—who was actually an undercover officer—picked the defendant up and drove to the hotel. This was the first time the defendant saw the CI in person since contacting her on Facebook. The undercover officer gave the defendant the key to the hotel room, which contained money, jewelry, fake cocaine, and half a kilo of cocaine locked in a safe. All of the items in the hotel room were placed there by the sheriff's office. Once inside the room, the defendant went straight for the safe, removed it from the room, and put it in the car. He then went back in and took the currency, jewelry, and fake cocaine.

After his arrest, the defendant waived his *Miranda* rights. He admitted that the CI did not promise sexual relations or to be his girlfriend in exchange for his commission of the burglary.

Subsequently, the defendant was charged with trafficking in cocaine, burglary of a dwelling, and grand theft. The defendant filed a motion to dismiss based on subjective and objective entrapment. He testified that while he was on probation, he was not committing any crimes and did not have any intention to commit any crimes. The defendant thought a sexual relationship with the CI could be an option or a possibility. On cross-examination, however, the defendant again admitted that the CI never promised him sexual relations or to be his girlfriend.

The trial court granted the motion to dismiss. The trial court found subjective entrapment because the CI, a government agent, induced the defendant with a promise to spend time with him and the defendant was not predisposed to commit this crime. As to objective entrapment, the court found that BSO provided all of the elements of the crime committed by the defendant.

The standard of review of an order dismissing the charging document is de novo. *Senger v. State,* 200 So. 3d 137, 143 (Fla. 5th DCA 2016).

3

## 1. OBJECTIVE ENTRAPMENT

We begin our analysis with a discussion of objective entrapment. "Objective entrapment analysis focuses on the conduct of law enforcement and operates as a bar to prosecution in those instances where the government's conduct so offends decency or a sense of justice that it amounts to a denial of due process." *State v. Henderson*, 955 So. 2d 1193, 1194 (Fla. 4th DCA 2007) (citation and internal quotation marks omitted). "[I]n the presence of egregious law enforcement conduct, an entrapment defense is to be evaluated under the due process provision of article I, section 9, of the Florida Constitution." *Munoz v. State*, 629 So. 2d 90, 99 (Fla. 1993).

"Cases finding a due process violation based on outrageous government conduct have one common thread: affirmative and unacceptable conduct by law enforcement or its agent." *Bist v. State*, 35 So. 3d 936, 940 (Fla. 5th DCA 2010). In contrast, "creating nothing more than an opportunity to commit a crime is not prohibited." *State v. Laing*, 182 So. 3d 812, 817 (Fla. 4th DCA 2016). "Law enforcement may provide the facilities necessary to carry out the crime, and the mere use of deceit does not violate due process." *Bist*, 35 So. 3d at 940.

Florida courts have found objective entrapment only in a few circumstances where law enforcement's actions rose to the level of "outrageous" government conduct. *See Madera v. State*, 943 So. 2d 960, 962 (Fla. 4th DCA 2006) (finding due process violation where a CI made promises of an intimate relationship, including sexual relations, if defendant assisted her in obtaining drugs); *Farley v. State*, 848 So. 2d 393, 397-98 (Fla. 4th DCA 2003) (finding due process violation where taskforce illegally manufactured child pornography with intent to lure defendant into purchasing such material); *Soohoo v. State*, 737 So. 2d 1108, 1111 (Fla. 4th DCA 1999) (finding a due process violation where an undercover agent offered defendant a consignment arrangement for the sale of drugs); *State v. Finno*, 643 So. 2d 1166, 1169 (Fla. 4th DCA 1994) (finding due process violation where government agents investigated defendant for several months and, after finding no evidence of criminal activity, showed defendant how to conduct a loansharking operation); *State v. Williams*, 623 So. 2d 462, 466 (Fla. 1993) (finding due process violation where law enforcement illegally manufactured crack cocaine for use in a reverse sting operation).

In finding that BSO violated the defendant's due process rights, the trial court relied on *Finno*. That case is clearly distinguishable because in *Finno*, government agents showed the defendant how to conduct a

loansharking operation after investigating the defendant for several months and finding no evidence of prior criminal activity. 643 So. 2d at 1170. Unlike in *Finno*, where the defendant was unfamiliar with how to run a loansharking operation, in this case the defendant had a criminal history involving burglaries and BSO did not teach the defendant how to commit a burglary. The defendant, for example, knew to wipe off his fingerprints at the crime scene.

This case is more akin to *State v. Blanco*, 896 So. 2d 900 (Fla. 4th DCA 2005) (en banc). In *Blanco*, law enforcement received information that drugs were being sold at a bar. An undercover officer went to the bar and sat next to the defendant. The officer told the defendant that he liked to "party," meaning that he liked to use cocaine. After going to the restroom, the defendant told the officer that no one was selling cocaine, but someone was selling "crystal meth." The officer gave money to the defendant, who returned with the drugs. The trial court found that the officer indicated he was socially interested in the defendant by approaching the defendant while he was sitting alone at a bar and striking up a conversation. The trial court concluded this violated due process and dismissed the charges. This court reversed, however, finding that the government's actions did not rise to the level of outrageous conduct required to support a finding of entrapment on due process grounds. *Id.* at 902. Rather, law enforcement officers merely utilized undercover officers to find dealers after being alerted that drugs were being sold at the bar. *Id.*

In this case, law enforcement did not engage in the level of outrageous conduct required to support a finding of objective entrapment. Although predisposition of the defendant is not a factor in objective entrapment analysis, *see Laing*, 182 So. 3d at 816, in this case law enforcement presented the defendant with the "Hotel Scenario" only after being informed that the defendant was committing burglaries and confirming that the defendant had a history of committing burglaries. Further, unlike in *Madera*, 943 So. 2d at 962, which found a due process violation where the CI made an explicit promise of sexual relations in exchange for assisting in the commission of the crime, here the defendant admitted that the CI did not make any explicit promises of a sexual relationship.

Federal courts have also declined to find outrageous government conduct in scenarios involving reverse sting operations similar to that employed in this case. *See United States v. Cazy*, 618 Fed. Appx. 569, 572 (11th Cir. 2015) (finding no outrageous conduct where government agent contacted defendant, after CI advised that defendant was involved in drug-related robberies, and told defendant where drug traffickers kept their cocaine in exchange for defendant promising agent share of stolen

cocaine); *United States v. Blitch*, 773 F.3d 837, 844-45 (7th Cir. 2014) (finding no entrapment where agents, as part of sting operation, promised defendants large sum of money and drugs if they robbed stash house); *United States v. Lopez-Mejia*, 510 Fed. Appx. 561, 563 (9th Cir. 2013) (finding no outrageous conduct in setting up sting operation with fictional stash house to catch criminals involved in home invasion robberies); *United States v. Maurino*, 379 Fed. Appx. 861, 862-63 (11th Cir. 2010) (finding no inducement where undercover officer set up reverse sting operation and provided defendant with opportunity to rob cocaine from fictitious stash house; defendant immediately showed interest in participating in the crime and declined invitations to back out of the plan).

In this case, law enforcement simply conducted a reverse sting operation providing the defendant with the means and opportunity to engage in a burglary, and he agreed to participate. Due process was not violated since the state's conduct in this case did not amount to the type of "outrageous" conduct prohibited by the Florida and United States Constitutions.

## 2. SUBJECTIVE ENTRAPMENT

We next turn to the question of subjective entrapment. Subjective entrapment "is applied in the absence of egregious law enforcement conduct and focuses on inducement of the accused based on an apparent lack of predisposition to commit the offense." *Henderson*, 955 So. 2d at 1194. (citation omitted). Florida Statutes codify the subjective entrapment defense, which provides:

> (1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, *he or she induces or encourages* and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which *create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.*

> (2) A person prosecuted for a crime shall be acquitted if the person proves by a preponderance of the evidence that his or her criminal conduct occurred as a result of an entrapment. *The issue of entrapment shall be tried by the trier of fact.*

§ 777.201, Fla. Stat. (2014) (emphasis added). Thus, under the three-part test to determine if there is subjective entrapment, one must consider (1) whether a government agent induced the defendant to commit the crime charged; (2) whether the defendant was predisposed to commit the crime charged; and (3) whether the entrapment defense should be evaluated by the jury. *Munoz*, 629 So. 2d at 99.

As to the first question, the defendant must prove by a preponderance of the evidence that an agent of the government induced him to commit the offense. *Id.* "'Inducement' includes 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.'" *Henderson*, 955 So. 2d at 1195 (quoting *Farley*, 848 So. 2d at 395. "Inducement cannot be found by prompting or creating an opportunity." *Marreel v. State*, 841 So. 2d 600, 603 (Fla. 4th DCA 2003).

The trial court found that the CI induced the defendant with "a promise of some kind of relationship through the promise of spending of additional time with the Defendant." As we have already noted, the CI's statement to the defendant that he would get to spend the day with her is clearly not the type of inducement that was condemned in *Madera*. The defendant would necessarily spend time with the CI in order to commit the crime. Additionally, the defendant admitted that the CI did not promise him a sexual relationship or to be his girlfriend. However, one could interpret this statement to mean that the CI would spend time with the defendant after the commission of the offense, especially since the CI offered to buy him drinks to celebrate. Because reasonable persons could draw different conclusions from the facts, the trial court cannot determine as a matter of law that the defendant was induced. *See Munoz*, 629 So. 2d at 100; *cf. Madera*, 943 So. 2d at 961-62.

As to the second element of subjective entrapment, the defendant must prove lack of predisposition. *Munoz*, 629 So. 2d at 99. Predisposition is of paramount importance since, as Justice Cardozo stated, "The state has, indeed, no interest to be promoted by the prosecution of the innocent." *Union Exch. Nat'l Bank of New York v. Joseph*, 131 N.E. 905, 906 (N.Y. 1921). Predisposition refers to "whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense." *Munoz*, 629 So. 2d. at 99. Once the defendant meets his burden of showing no predisposition, the burden shifts to the prosecution to rebut the defendant's evidence beyond a reasonable doubt. *Id.* Predisposition can be shown through evidence of the defendant's prior convictions. *Id.*; *Story v. State*, 355 So. 2d 1213, 1215 (Fla. 4th DCA 1978). "[P]redisposition to commit the offense can [also] be

inferred from evidence that the defendant readily acquiesced in the commission of the proposed offense." *Story*, 355 So. 2d at 1216; *see also Gonzalez v. State*, 571 So. 2d 1346, 1350 (Fla. 3d DCA 1990) ("[T]he prosecution may prove predisposition by showing that the defendant had prior convictions for similar crimes . . . or that the defendant showed ready acquiescence to commit the crime.") (citation and internal quotation marks omitted).

Although the defendant testified that he was not committing any crimes and did not have any intention to commit any crimes, the state presented evidence that the defendant readily agreed to the burglary, continued to communicate a desire to commit the burglary, and never wavered in his commitment. The CI did not put any pressure on the defendant and did not need to repeatedly ask him in order to get him to agree to the crime. In fact, the defendant initially contacted the CI. *Cf. State v. Ramos*, 632 So. 2d 1078, 1079 (Fla. 3d DCA 1994) (finding inducement where the CI contacted the defendant fifteen or sixteen times to convince him to get involved in the drug transaction). Additionally, the defendant had an extensive criminal history including, significantly, convictions for burglary and was on probation for burglary at the time of the crime. In light of the state's evidence rebutting the defendant's evidence of lack of predisposition, the trial court could not find inducement as a matter of law.

The third question is whether the issue of entrapment should be submitted to a trier of fact. *Munoz*, 629 So. 2d at 100. Section 777.201 directs that the issue of entrapment be submitted to the trier of fact. Additionally, the first two questions under the subjective test ordinarily present questions of disputed facts to be submitted to the jury as the trier of fact. *Munoz*, 629 So. 2d at 100.

> [I]f the factual circumstances of a case are not in dispute, if the accused establishes that the government induced the accused to commit the offense charged, and if the State is unable to demonstrate sufficient evidence of predisposition prior to and independent of the government conduct at issue, then the trial judge has the authority to rule on the issue of predisposition as a matter of law because no factual "question of predisposition" is at issue.

*Id.* (citations omitted). Thus, the question of predisposition must be submitted to a jury "when factual issues are in dispute or when reasonable persons could draw different conclusions from the facts." *Id.*

8

Here, the trial court erred in holding the defendant was entrapped as a matter of law. Reasonable persons could draw different conclusions from the CI's statement that the defendant would get to spend the day with her. *See id.* Additionally, the defendant readily acquiesced in the commission of the crime and had an extensive criminal history. *See State v. Aldrich*, 448 So. 2d 1254, 1254 (Fla. 4th DCA 1984) (finding trial court erred in holding defendants were entrapped as a matter of law where defendants readily acquiesced in the commission of the crime). Therefore, this matter should have been decided by the jury as a trier of fact. "The factual dispute between the State and the defendant prevents the resolution of subjective entrapment on a motion to dismiss. A jury may very well find the defendant not guilty on the basis of subjective entrapment. That, however, is a decision for another day." *Blanco*, 896 So. 2d at 902.

In sum, law enforcement did not engage in the type of "outrageous" conduct required to constitute objective entrapment. Additionally, under the facts of this case, a court cannot determine as a matter of law whether the defendant was induced. Rather, in this case whether the defendant was subjectively entrapped presents a question for the jury as the trier of fact. Therefore, we reverse the dismissal order and remand for further proceedings.

*Reversed and remanded.*

FORST, J., and ARTAU, EDWARD L., Associate Judge, concur.

\*     \*     \*

**Not final until disposition of timely filed motion for rehearing.**

9